**The UNITED STATES, Appellant,**

**v.**

**AMDAHL CORPORATION, Appellee.**

**Appeal No. 85–2760.**

United States Court of Appeals, Federal Circuit.

March 6, 1986.

Contract Appeals (GSBCA or board) in a bid protest proceeding, No. 7859–P–R, brought under 40 U.S.C. § 759 (1982) *as amended by* the Competition in Contracting Act of 1984 (CICA), Pub.L. No. 98–369, § 2713, 98 Stat. 494, 1182 (1984) (to be codified at 40 U.S.C. § 759(h)).[1] The Department of Treasury purchased a used mainframe computer and certain related equipment from the Federal Home Loan Mortgage Corporation (Freddie Mac) on a sole source basis. Amdahl Corporation successfully protested the award to Freddie Mac. GSBCA held, *inter alia,* that the award was contrary to statute and regulation and revoked Treasury's DPA. On appeal, Treasury does not seek to overturn the merits of the protest. Rather, Treasury argues that the remedy which GSBCA granted in these proceedings is contrary to 40 U.S.C. § 759(h)(6)(B) of the statute. We reverse GSBCA's holding that § 759(h)(6)(B) does not apply, vacate a portion of its decision on the effect of the remedy, and remand for further proceedings consistent herewith.

Michael T. Paul, of Commercial Litigation Branch, Dept. of Justice, Washington, D.C., for appellant. With him on brief were Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director and Ronald A. Schechter. David Ingold, of Dept. of Treasury, Washington, D.C., of counsel.

Charlene Bofinger, Asst. Regional Counsel, Amdahl Corp., Washington, D.C., for appellee.

Before RICH, Circuit Judge, SKELTON, Senior Circuit Judge, and NIES, Circuit Judge.

NIES, Circuit Judge.

## DECISION

This appeal is from the decision of the General Services Administration Board of

### Statutes

The Brooks Act, Pub.L. No. 89–306, 79 Stat. 1127 (1965) (codified as amended at 40 U.S.C. § 759 (1982)), grants the administrator of the General Services Administration (GSA) centralized authority over the government's acquisition of automatic data processing (ADP) equipment. The administrator may exercise this authority himself, by actually acquiring ADP equipment for another federal agency, or may delegate his procurement authority to that agency, so that the agency can acquire ADP equipment on its own, consistent with the terms of the delegation. 40 U.S.C. §§ 759(b)(1), (2). By this centralized system, Congress sought to encourage the efficient, cost-effective purchase of ADP equipment. S.Rep. No. 938, 89th Cong., 1st Sess. 1, *reprinted in* 1965 U.S.Code Cong. & Ad. News 3859.

---

1. Our jurisdiction over the appeal rests on the provision of CICA, to be codified at 40 U.S.C. § 759(h)(6)(A), making a protest decision appealable as set forth in the Contract Disputes Act of 1978 (41 U.S.C. § 607(g)). Thus, 28 U.S.C. § 1295(a)(10) applies.

In 1984, the Brooks Act was amended by CICA, *supra*, which added a new section, § 759(h). The new section provides, *inter alia*, for GSBCA to determine protests with respect to the procurement of computer equipment.[2] In particular, the board shall, upon request of an interested party, "review any decision [regarding computer procurement] by a contracting officer alleged to violate a statute or regulation." *Id.*

Specific authority to remedy violations is granted to the board by § 759(h)(5)(B) (hereinafter § 5(B)) [3]:

If the board determines that a challenged agency action violates a statute or regulation or the conditions of any delegation of procurement authority issued pursuant to this section, the board may suspend, revoke, or revise the procurement authority of the Administrator or the Administrator's delegation of procurement authority applicable to the challenged procurement.

The statute further provides in § 759(h)(6)(B) (hereinafter § (6)(B)):

If the board revokes, suspends, or revises the procurement authority of the Administrator or the Administrator's delegation of procurement authority after the contract award, *the affected contract shall be presumed valid* as to all goods or services *delivered and accepted* under the contract before the suspension, revocation, or revision of such procurement authority or delegation. [Emphasis added.]

The provisions of § (6)(B) are the focus of this appeal.

### Background

On December 27, 1984, GSA granted the Department of Treasury, Financial Management Service, a delegation of procurement authority (DPA) to acquire a used IBM 3081–K32 main frame computer from the Federal Home Loan Mortgage Corporation (Freddie Mac) on a sole source basis. GSA, however, did not specifically approve or disapprove the acquisition as outlined by Treasury. The DPA stated that Treasury was required to "achieve maximum practicable competition in satisfying this automatic data processing (ADP) requirement" and to comply "with all applicable regulations governing the acquisition, management and utilization of ADP resources."

On December 31, 1984, Treasury and Freddie Mac entered into a sales agreement. The agreement provided that upon execution, Treasury "shall have acquired" the equipment in question, which would be stored at the Freddie Mac facilities until March 31, 1985. Treasury did not at that time have a location for the equipment. The agreement also required that within 30 days Freddie Mac was to provide an IBM certificate of maintainability, that is, the manufacturer had to certify that the equipment was in proper working order. Treasury was also required "to accept the equipment and move the equipment to its facilities no later than March 31, 1985." The total purchase price was $4,189,000 with $1.2 million due when the agreement was signed and the balance due in fiscal year 1986. Freddie Mac was to retain title to the equipment until the final payment was made. The initial payment of $1.2 million was designated as liquidated damages in the event Treasury failed to make payment in full.

Freddie Mac provided the certificate of maintainability in a timely fashion. On

---

**2.** The grant of authority to GSBCA is non-exclusive. Protests may also be made in other forums. See Hiestand & Williamson, *The New Federal Procurement System: Is Anyone in Charge,* 17 U.C.C. Law Journal 355 (1985), for an outline of this recent legislation.

**3.** Under § 759(h)(5)(C), the GSBCA may also declare an interested party entitled to costs of the protest including attorney fees and costs of

bid preparation. Under § 759(h)(6)(C), nothing precludes GSBCA from ordering additional relief which it is authorized to provide under any other statute or regulation. However, no additional authority has been noted which applies to these proceedings. GSBCA's jurisdiction under the Contracts Dispute Act of 1978, 41 U.S.C. §§ 601 *et seq.,* over disputes involving contracts *with* GSA itself is not involved here.

March 29, 1985, Treasury contracted to have the computer equipment moved to Freddie Mac's Reston, Virginia, facility because Treasury's new computer space was still not ready. The equipment was moved at a cost to Treasury of approximately $60,000 and occupies space leased by Treasury from Freddie Mac.

On March 15, 1985, Amdahl Corporation filed a protest with the GSBCA challenging the sale as a violation of the Brooks Act.[4] While the protest had not been filed within ten days after award of the contract, as required by GSBCA regulation (to be codified at 48 C.F.R. § 6101.5(b)(3)(ii)), the GSBCA held that it was, nevertheless, timely because it was promptly filed after Amdahl learned of the sale.

With respect to the merits of the protest, the board held that Treasury's agreement with Freddie Mac violated both statute and regulation and, thus, the conditions of the delegation of the ADP procurement authority which Treasury had been given by GSA. In particular, the board held that the $1.2 million payment for the equipment upon signing of the contract but before actual physical delivery was a violation of 31 U.S.C. § 3324(a) which provides that contract payments "may not be more than the value of the ... article already delivered." It also held that Treasury had made no attempt to determine whether suitable equipment was available from other sources and had not properly determined the acquisition costs in accordance with regulations. By a decision dated May 16, 1985, the board granted the protest and revoked the Treasury's DPA in accordance with the statutory remedy in § (5)(B) noted above.

Upon consideration of that decision, Treasury filed a motion asking the board to clarify its ruling regarding relief.[5] Treasury asked GSBCA to rule that because the computer equipment had been "delivered and accepted" within the meaning of § (6)(B) before the board revoked the DPA, Treasury's agreement with Freddie Mac was valid with respect to those goods, that the agreement was unaffected by the revocation and that Treasury could make the final payment when due. In response, Amdahl argued that the equipment had not been delivered and accepted because Freddie Mac retained title and possession and that rescission of the contract was appropriate.

The board ruled that § (6)(B) did not apply and held the contract void *ab initio*. The following quotation is the portion of the board's supplemental opinion dated June 27, 1985 (not reported), which discusses the issues before us:

> We agree with the protestor that the statutory presumption of validity contained in the CICA [§ 6(B)] is inapplicable to respondent's agreement with Freddie Mac. The payment provisions of this agreement so clearly and substantially violate the statutory prohibition against advance payments, 31 U.S.C. § 3324(a) (1982), 41 U.S.C. § 255(c) (1982), that the agreement is plainly illegal and void *ab initio*. We have a duty to strike down such illegal contracts, and we must exercise that duty here. *Toyo Menka Kaisha, Ltd. v. United States*, 220 Ct.Cl. 210, 217–20, 597 F.2d 1371, 1376–77 (1979); *Alabama Rural Fire Insurance Co. v. United States*, 215 Ct.Cl. 442, 452–60, 572 F.2d 727, 734–36 (1978); *Schoenbrod v. United States*, 187 Ct.Cl. 627, 634–35, 410 F.2d 400, 404 (1969). While we are not unsympathetic with the plight of Freddie Mac, we cannot bind the respondent to an unauthorized agreement

---

**4.** Treasury maintained below that GSBCA had no jurisdiction because Treasury had effected an interagency transfer with Freddie Mac under the Economy Act, 31 U.S.C. § 1535. However, GSBCA held that the Brooks Act preempted the Economy Act where the subject of the interagency transfer is ADP equipment, thus, giving GSBCA jurisdiction. We also note that Freddie Mac's tax-exempt status ended on January 1, 1985.

**5.** GSA also sought modification of the May 16, 1985, decision because of erroneous findings of fact concerning GSA's knowledge of Treasury's intent to justify its acts under the Economy Act. *See infra* note 4. The board made the modifications requested by GSA.

even though rescission might be inequitable. Just as any other Government contractor, Freddie Mac assumed the risk that the respondent had actual authority to enter into the bargain to which the parties had agreed. *Yosemite Park and Curry Co. v. United States*, 217 Ct.Cl. 360, 370, 582 F.2d 552, 558 (1978). We point out that Freddie Mac is not entirely without a remedy. It is entitled to recover on a *quantum valebant* basis for the reasonable value in the market place of the use that respondent has so far made of the equipment. *Urban Data Systems, Inc. v. United States*, 699 F.2d 1147, 1154 (1983) (citing *Cities Service Gas Co. v. United States*, 205 Ct.Cl. 16, 32, 500 F.2d 448, 457 (1974)).

It may also be (although we need not decide), that the other violations of statute, regulations, and the conditions of GSA's DPA that are detailed in our decision of May 16, 1985, are so plain and palpable that the agreement is a nullity for these reasons as well. In no event does Freddie Mac have the right to retain the $1,200,000 advance payment. It is well within our jurisdiction to put an end to respondent's agreement with Freddie Mac, and that is exactly what we have done. Assuming *arguendo* that this agreement is voidable, rather than void, the most that Freddie Mac may recover is its costs of performance plus a reasonable profit on those costs. *See, e.g., Dairy Sales Corp. v. United States*, 219 Ct.Cl. 431, 436–37, 593 F.2d 1002, 1005 (1979) (per curiam); *Trilon Educational Corp. v. United States*, 217 Ct.Cl. 266, 276–77, 578 F.2d 1356, 1362 (1978); *G.C. Casebolt Co. v. United States*, 190 Ct.Cl. 783, 785–88, 421 F.2d 710, 711–13 (1970).

There is one final matter. Respondent is clearly under a duty to recover the unlawful $1,200,000 payment that it made to Freddie Mac on December 31, 1984.

*Amdahl Corp.*, No. 7859–P–R, slip op. at 6–7 (GSBCA June 27, 1985).

## I.

On appeal, Treasury advances two positions: (1) that the ADP equipment had been delivered and accepted prior to revocation of its DPA and (2) that it is clear from the legislative history that § (6)(B) creates an irrebuttable presumption that the contract is valid for such goods, thereby preventing GSBCA from ordering their return and the recovery of the initial payment. Per Treasury, by imposing the remedy in this case, GSBCA creates an unlawful exception to § (6)(B). Amdahl counters (1) that the goods were not delivered and accepted and (2) that § (6)(B) creates only a rebuttable presumption of validity with respect to goods delivered and accepted which was overcome in this case. Therefore, per Amdahl, GSBCA could and did properly order Treasury to return the goods and recover the illegal advance payment from Freddie Mac.

## A.

To understand the effect of § (6)(B), it is necessary to review the precedent that deals with the question of when a government contract which violates statute or regulation is held to be voidable, rather than void *ab initio*, and the effect of such a holding.

We start with the proposition that the failure of a contracting officer to comply with statutory requirements in making an award renders the contract a nullity.

"The government has the power to act only through its agents whose authority and manner of exercise thereof is rigidly prescribed and limited by statute, regulation, and judicial and administrative determinations. Failure to follow the applicable rules negates the agent's authority to enter into a contract binding on the government. To permit otherwise would be to nullify those very statutes, regulations, and determinations—a result clearly contrary to the public interest."

Brous, *Termination for Convenience: A Remedy for the Erroneous Award*, 5 Pub. Cont.L.J. 221, 222–23 (1972) (footnotes omitted). Administrative actions taken in

violation of statutory authorization or requirement are of no effect. *Utah Power v. U.S.*, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917). As the board stated, a contractor "assumed the risk" that an agency "had actual authority to enter into the bargain to which the parties agreed." *Accord Urban Data Systems, Inc. v. United States*, 699 F.2d 1147, 1154 (Fed.Cir.1983); *Yosemite Park and Curry Co. v. United States*, 582 F.2d 552, 558 (Ct.Cl.1978). The courts are bound to strike down illegal contracts. *Alabama Rural Fire Insurance Co. v. United States*, 572 F.2d 727 (Ct.Cl.1978). Thus, no damages can be awarded for "breach" of a nullity. *Schoenbrod v. United States*, 410 F.2d 400 (Ct.Cl.1969).

■ On the other hand, in many circumstances it would violate good conscience to impose upon the contractor *all* economic loss from having entered an illegal contract. Where a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a *quantum valebant* or *quantum meruit* [6] basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity. The contractor is not compensated *under* the contract, but rather under an implied-in-fact contract. As stated in *Prestex, Inc. v. United States*, 320 F.2d 367, 373 (Ct.Cl.1963):

> Even though a contract be unenforceable against the Government, because not properly advertised, not authorized, or for some other reason, it is only fair and just that the Government pay for goods delivered or services rendered and accepted under it. In certain limited fact situations, therefore, the courts will grant relief of a quasi-contractual nature when the Government elects to rescind an invalid contract. No one would deny that ordinary principles of equity and justice preclude the United States from

retaining the services, materials, and benefits and at the same time refusing to pay for them on the ground that the contracting officer's promise was unauthorized, or unenforceable for some other reason. However, the basic fact of legal significance charging the Government with liability in these situations is its retention of benefits in the form of goods or services.

See also *Urban Data Systems, Inc. v. United States*, 699 F.2d at 1154; *Cities Service Gas Co. v. United States*, 500 F.2d 448 (Ct.Cl.1974).

■ Since the amount of recovery by the contractor under this theory is limited to the value of the benefits *to the government*, it follows that if the government receives no benefit from the contractor's performance, the contractor receives no compensation. *See, e.g., Prestex, Inc. v. United States*, 320 F.2d 367, 373 (Ct.Cl. 1963); *Schoenbrod v. United States*, 187 Ct.Cl. 627, 634–35, 410 F.2d 400, 404 (1969); *Toyo Menka Kaisha, Ltd. v. United States*, 597 F.2d 1371, 1376–77 (Ct.Cl.1979).

An alternative theory of relief for contractors was developed in the landmark decision *John Reiner & Co. v. United States*, 325 F.2d 438 (Ct.Cl.1963), *cert. denied*, 377 U.S. 391, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964). In *Reiner*, a contractor sued the government on the ground of breach of contract for cancelling its contract at the behest of the Comptroller General following a protest. The *Reiner* contractor was neither the cause of, nor aware of the illegality in the award. Judge Davis, writing for the court, recognized the inequity of relegating an *innocent* contractor to recovery simply for benefit conferred on the government. In many cases there would be, for example, start-up expenses for performance with no actual receipt of benefit by the government.

The *Reiner* court stated:

6. Our predecessor, the Court of Claims, applied *quantum meruit*, translated "as much as he merited," to recovery on any implied in fact contract, whether for goods or services. *Quantum valebant*, translated "as much as it was worth," has traditionally applied to implied in fact contracts involving goods. *Urban Data Systems, Inc. v. U.S.*, 699 F.2d at 1154–55 n. 8.

[W]here a problem of the validity of the invitation or the responsiveness of the accepted bid arises after the award, the court should ordinarily impose the binding stamp of nullity only when the illegality is plain. If the contracting officer has viewed the award as lawful, and it is reasonable to take that position under the legislation and regulations, the court should normally follow suit. Any other course could place the contractor in an unfortunate dilemma. If he questions the award and refuses to accept it because of his own doubts as to possible illegality, the contracting officer could forfeit his bid bond for refusing to enter into the contract. The full risk of an adverse decision on validity would then rest on the bidder. If he accedes to the contracting officer and commences performance of the contract, a subsequent holding of non-enforceability would lead to denial of all recovery under the agreement even though the issue of legality is very close; and under the doctrine of quantum meruit there would be no reimbursement for expenses incurred in good faith but only for any tangible benefits actually received by the defendant. *United States v. Mississippi Valley Generating Co.,* 364 U.S. 520, 566 n. 22, 81 S.Ct. 294, [317 n. 22] 5 L.Ed.2d 268 (1961); *Clark v. United States,* 95 U.S. 539, 542, [5 Otto 539, 542] 24 L.Ed. 518 (1877). It is therefore just to the contractor, as well as to the Government, to give him the benefit of reasonable doubts and to uphold the award unless its invalidity is clear.

325 F.2d at 440 (footnote omitted). After determining that the invalidity of the contract award was not plain, the court held

"that the award to plaintiff must be *deemed* lawful, not void." *Id.* at 442 (emphasis added).

■ Notwithstanding the "deemed" initial lawfulness of the contract, the *Reiner* court did not award damages for its *breach.* Rather, the court converted the rescission of the contract into a termination *under* the contract's termination-for-convenience-of-the-government clause.[7] The contract was, thus, treated as valid up to the time of cancellation. *Accord, Brown & Son Electric Co. v. United States,* 325 F.2d 446 (Ct.Cl.1963) (contract cancelled by agency, after Comptroller General upheld protest, held voidable and terminated for convenience because "no plain illegality"); *Warren Brothers Roads Co. v. United States,* 355 F.2d 612 (Ct.Cl.1965) (contract cancelled, after protest, held voidable because illegality was not "palpable"). Under a termination-for-the-convenience-of-the-government clause, the amount of recovery is the cost of performance plus a reasonable profit on those costs whether or not benefit accrued to the government. See 48 C.F.R. § 52.249–2 (1984); *Dairy Sales Corp. v. United States,* 593 F.2d 1002, 1004 (Ct.Cl.1979).

*Trilon Educational Corp. v. United States,* 578 F.2d 1356 (Ct.Cl.1979), (which also dealt with cancellation after protest) provided additional guidance on the meaning of "plain" or "palpable" error. In awarding relief, the court distinguished *Schoenbrod* and *Prestex* as "situations where the departures from applicable statutes and regulations were both obvious to the bidder and so substantial as to require the conclusion that the putative contracts were void *ab initio.*" *Id.* at 1360. In

7. The explanation was as follows:
   The contracting officer on plaintiff's contract probably thought that he was cancelling the agreement for illegality. That excuse was not a valid justification as we now know, but just as in *College Point Boat Corp. [v. United States,* 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490 (1925) ], a good ground did exist in the far-reaching right to terminate under the termination article. That justifiable cause controls the case and "operate[s] to curtail the dam-

ages recoverable" (267 U.S. at 16, 45 S.Ct. at 201).
325 F.2d at 443. Even where there is no justification for the government's cancelling a contract, it is now an accepted principle that the contractor's recovery is limited by the termination-for-convenience clause. *Coastal Cargo Co. v. U.S.,* 351 F.2d 1004 (Ct.Cl.1965); *Goldwasser v. U.S.,* 325 F.2d 722 (Ct.Cl.1963).

doing so, the court recognized that its goal was to protect innocent contractors:

> Procurement officers must find their way through a maze of statutes and regulations, which bidders know little about. It would be unfair for [contractors] to suffer for every deviation. Therefore, when the deviation is not egregious, the court has preferred to allow the contractor to recover on the ground that the contracts were not palpably illegal *to the bidder's eyes.* [Emphasis added.]

*Id.*

The precedent of the Court of Claims was succinctly summarized in a decision of the Comptroller General, B–176393, 52 Comp.Gen. 214, 218 (1972) as follows:

> We are in agreement with the position of the Court of Claims that "the binding stamp of nullity" should be imposed only when the illegality of an award is "plain," *John Reiner & Co. v. United States,* 325 F.2d 438, 440 (163 Ct.Cl. 381) or "palpable," *Warren Brothers Roads Co. v. United States,* 355 F.2d 612, 615 (173 Ct.Cl. 714). In determining whether an award is plainly or palpably illegal, we believe that if the award was made contrary to statutory or regulatory requirements because of some action or statement by the contractor (*Prestex, Inc. v. United States,* 320 F.2d 367 (162 Ct.Cl. 620), or if the contractor was on direct notice that the procedures being followed were violative of such requirements (*Schoenbrod v. United States,* 410 F.2d 400 (187 Ct.Cl. 627), then the award may be canceled without liability to the Government except to the extent recovery may be had on the basis of *quantum meruit.* On the other hand, if the contractor did not contribute to the mistake resulting in the award and was not on direct notice before award that the procedures being followed were wrong, the award should not be considered plainly or palpably illegal, and the contract may only be terminated for the convenience of

the Government. *John Reiner & Co. v. United States, supra; Brown & Son Electric Co. v. United States,* 325 F.2d 446 (163 Ct.Cl. 465).

*Accord, Southwest Marine, Inc.,* No. B–2194232 (Comp.Gen. Nov. 25, 1985); *Memorex Corp.,* No. B–213430.2 (Comp.Gen. Oct. 23, 1984).

■ From the above precedent, several things become clear. First, a contractor is entitled to his day in court to determine his rights vis-a-vis the government, regardless of the success of a protest. A determination that a contract is void *ab initio* or *voidable* in the protest is not binding in the contractor's suit. Second, where conforming goods or services have been delivered by a contractor and accepted by the government, the contractor has been held entitled to payment, either on a *quantum valebant* or *quantum meruit* basis if the contract is void *ab initio* or to a possibly larger amount if the contract is voidable, that is, deemed valid and terminated for convenience in accordance with the contract. None of the above precedent supports an *order* to return conforming goods as a remedy even where a contract is held to be void *ab initio.*[8]

### B.

■ We turn now to the Brooks Act and GSBCA's protest jurisdiction. GSBCA has authority under the statute to determine whether a contract award violates a statute or regulation and to modify, revoke or suspend procurement authority. It does not sit to settle the rights of a terminated contractor vis-a-vis the government, a matter not litigated in the protest nor within its protest jurisdiction. Such matters must be resolved in the traditional forums for their resolution. While § 759 grants GSBCA no explicit authority to "declare" a contract void *ab initio,* that result follows from the authority of GSBCA to "revoke" a DPA. To revoke means to rescind, to cancel, to repeal. *Websters Third New Internation-*

---

8. The remedy may be different in a case involving fraud or the like, a matter not involved here. *See K & R Engineering Co. v. U.S.,* 616 F.2d 469 (Ct.Cl.1980) (contractor denied *quantum meruit* recovery because of violation of conflict of interest statute).

*al Dictionary* 1944 (1969). Thus, the contract would be void *ab initio*, in the absence of the saving provision of § (6)(B).

■ We conclude that § (6)(B) preserves the existing precedent with respect to protecting contractors who have performed under a contract which is later "rescinded" by GSBCA. In a sense, it is a limitation on the board's authority in that the board may not force the government to undo all that has occurred.[9] Like the courts, the board should accept the situation as it exists. Section (6)(B) is a statute of at least partial repose.[10]

■ Additionally, while the language of § (6)(B) is not artfully drawn,[11] it also has effect in subsequent litigation between the terminated contractor and the agency. The courts and other forums remain free, even though the GSBCA has revoked a DPA causing a rescission, to grant innocent contractors greater relief by deeming the contract valid and terminating the contract under the termination-for-convenience clause.

■ We do not, however, read § (6)(B) as the government urges, as creating a conclusive presumption of validity of the contract merely because goods have been delivered and accepted. There is no indication that Congress intended to afford all contractors the benefit of a conclusive presumption. The "presumed valid" language appears apt. On the other hand, if GSBCA ·determines that a contract is void *ab initio*, contrary to Amdahl's view, it does not follow that an agency can be ordered to return goods that have been delivered and accepted. Indeed, an order to return goods

would be meaningless since GSBCA has no power to compel their acceptance.

### II.

In light of the above analysis, when we turn to the board's ruling in this case, it becomes readily apparent that the government has advanced, and Amdahl endorsed, an untenable interpretation of the relief which GSBCA ordered.

The government states the issue in this case in the following manner:

> Whether, in a bid protest action brought under the Competition in Contracting Act, Pub.L. 98–369, the General Services Board of Contract Appeals (GSBCA) had the authority to direct the Department of the Treasury to return computer equipment already delivered and accepted under a contract that the board determined had been awarded contrary to law.

*Nowhere* in the board's opinion is there an order for Treasury "to return" the ADP equipment. While not stated *in haec verba*, the board's entire analysis is dependent on its conclusion that the ADP equipment had not been delivered and accepted at the time it revoked Treasury's DPA. In the view of GSBCA, there was nothing for Treasury "to return"—only money to be recovered.

Specific language of the board supports this interpretation. For example, the board stated that the § (6)(B) presumption of validity *"is inapplicable,"* not that it applied and that there was an exception, or that the presumption had been overcome. Earlier in the opinion, the board had reviewed the respective arguments of the parties on

---

**9.** A parallel provision, § 759(h)(3)(B), authorizes the board to suspend a DPA during the protest only with respect to "any goods or services under the contract which are not previously delivered and accepted...."

**10.** Indeed, it appears little is served by the GSBCA's determination in most cases of whether the contract is void *ab initio* or voidable after conforming goods or services are delivered and accepted. Either way, performance under the contract is stopped and the contractor is entitled to compensation, a matter which is to be deter-

mined in other proceedings. However, since such a ruling may have another effect of which we are unaware, we make this comment merely as an aside.

**11.** We note that in proposed legislation in a parallel provision, the language is changed from "shall be presumed valid" to "shall not be presumed void ab initio." S. 2030, 99th Cong., 2d Sess., 132 Cong.Rec. S1032, S1033 (January 30, 1986).

whether delivery and acceptance had ever occurred. There is no discussion at all of its authority to order the return of goods if they had been delivered and accepted.

Significantly, GSBCA's statement that Treasury had a duty to recover the $1.2 million initial payment was not dependent on GSBCA's view that the contract was void *ab initio*. Treasury was required, per GSBCA, to recover the money even if the board was in error on that issue.

The discussion of the rights of Freddie Mac (even though dicta) are also revealing. GSBCA refers to Freddie Mac's right to recover *quantum valebant* for Treasury's *"use"* of the computer, a concept appropriate only if there had been no delivery and acceptance of the goods. As the above precedent indicates, precedent of which we have no doubt that GSBCA is aware, Freddie Mac is entitled, even where a contract is void *ab initio*, to the value of the *computer* once it had been delivered and accepted.

Finally, from a review of GSBCA decisions, it is apparent that GSBCA carefully distinguishes the effect of its ruling on goods which have been delivered and accepted from those that have not been. *See, e.g., Computer Lines*, No. 8246–P (GSBCA Nov. 21, 1985); *American Service Corp.*, No. 8224–P (GSBCA Oct. 30, 1985); *Tidewater Consultants, Inc.*, No. 8069–P (GSBCA Sept. 4, 1985).

For all of the above reasons, we conclude that the government's interpretation of the board's opinion is in error. GSBCA created no exception to § (6)(B). Rather, GSBCA accepted Amdahl's argument that the goods had not been delivered and accepted and held simply that § (6)(B) did not apply.

Thus, the determinative issue in this appeal becomes whether the board's conclusion is legally correct that the equipment was not delivered and accepted by Treasury prior to May 16, 1984, the effective date of revocation of Treasury's DPA.

III.

Amdahl's principal argument on behalf of the lack of delivery and acceptance is that the agreement between Treasury and Freddie Mac should be construed as an option to purchase. Amdahl relies on the contract provisions under which (1) Treasury had an option to extend the time for the second payment, (2) Freddie Mac retained title until full payment was made, and (3) the first payment became liquidated damages if Treasury did not make payment in full. Thus, per Amdahl, Treasury had no obligation to make the second payment and, until that "option" to acquire the goods was exercised, Treasury could not have "accepted" the goods. Amdahl also argues that Freddie Mac's continued possession, title and use negates Treasury's acceptance.[12]

Treasury counters that the contract was not an option to buy, but a sale of the equipment under an installment payment plan with the seller retaining title as a security interest until full payment was made. Read as a whole, we agree that Treasury advances the only reasonable interpretation.

The contract begins with the statement that, upon execution, Treasury "shall have acquired the equipment." Further, Treasury was specifically required to accept the equipment and move it by March 31, 1985, before the second payment was due. That Treasury might not make the second payment and, thereby, would lose its rights under the contract does not imbue the contract with the character of an option to purchase. Nor does the provision for forfeiture of the first payment as "damages," approximately one fourth of the total purchase price, convert the first payment into the price of such an option. Simply stated, a buyer's choice between performance and non-performance under a purchase contract does not mean that the buyer has only an option to buy. IA Corbin, *Contracts* § 259 at 463 (1963); 1 Williston, *Contracts* § 61B (3rd ed. 1957). Furthermore, the transfer

---

**12.** Between the sale and January 19, 1985, Freddie Mac used the equipment and has subsequently compensated Treasury for that period of use.

of title is *not,* as Amdahl urges, a condition precedent to a buyer's acceptance of goods. 4 Anderson, *Uniform Commercial Code* 103 (3rd ed. 1982).

With respect to delivery and acceptance, there is no dispute that Freddie Mac tendered the goods at the time of execution of the contract and retained them only for the convenience of the buyer, Treasury. Freddie Mac had no right thereafter to use the computer, because it belonged to Treasury, and paid Treasury for the approximate two week period in January during which it continued to use the equipment. Thereafter, Freddie Mac did not use the computer since it had acquired a replacement. The specific condition for acceptance by Treasury was that Freddie Mac supply IBM's certificate of maintainability which was promptly supplied. In March, 1985, Treasury paid to have the equipment moved and paid for space in Freddie Mac's facility because it was still without space of its own. The acts of the parties unequivocally point to delivery and acceptance at least by the March 31, 1985, date specified in the contract for acceptance.

Thus, we hold that the board's conclusion that the goods had not been delivered and accepted prior to the date GSBCA revoked Treasury's DPA was error, as a matter of law, and reverse its holding that § (6)(B) does not apply.

## IV.

### *Remedy*

The appeal is before us with no challenge by the government to the determination by GSBCA that the contract was illegally awarded or to the revocation of Treasury's DPA. The remaining questions relate to the effect of revocation where goods have been delivered and accepted.

 We reject Treasury's argument that the revocation has *no* effect on the contract. The contract was terminated prior to complete performance. Treasury is precluded from proceeding to make final payment under its terms and the liquidated damages provision is no longer of force or effect.

Since Treasury is not required to return the ADP equipment and Freddie Mac is entitled to compensation therefor, we vacate the board's holdings with respect to rights in the $1.2 million initial payment.

As the prevailing party in the protest, Amdahl has been awarded costs and attorney fees by GSBCA, *Amdahl Corp.,* No. 7965 (7859–P) (GSBCA July 12, 1985). That award is not disturbed by this decision.

## V.

We *reverse* the decision of GSBCA insofar as it holds that § (6)(B) does not apply, *vacate* the portion of the decision relating to rights in the initial payment, and *remand* for proceedings consistent herewith. Each party shall bear its own costs on this appeal.

REVERSED–IN–PART, VACATED–IN–PART AND REMANDED.