# United States Court of Appeals
# for the Federal Circuit

_____

**VERIDYNE CORPORATION,**
*Plaintiff-Cross-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

_____

2013-5011, -5012

_____

Appeals from the United States Court of Federal Claims in No. 06-CV-0150, Judge Christine O.C. Miller.

_____

Decided: July 15, 2014

_____

MARC LAMER, Kostos and Lamer, P.C., of Philadelphia, Pennsylvania, argued for plaintiff-cross-appellant.

ROBERT E. CHANDLER, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were STUART F. DELERY, Acting Assistant Attorney General, JEANNE E. DAVIDSON, Director, STEVEN J. GILLINGHAM, Assistant Director, and DOUGLAS T. HOFFMAN Trial Attorneys.

_____

Before DYK, CLEVENGER, and WALLACH, *Circuit Judges.*

DYK, *Circuit Judge.*

Veridyne Corporation ("Veridyne") sued to recover on its contract with the government. The Court of Federal Claims ("Claims Court") held that Veridyne's contract claim was forfeited under the Forfeiture of Fraudulent Claims Act, 28 U.S.C. § 2514, also known as the Special Plea in Fraud Statute, but awarded Veridyne partial recovery under a quantum meruit theory. The government appeals the quantum meruit award. The Claims Court also awarded penalties to the government under the False Claims Act, 31 U.S.C. § 3729, and the antifraud provision of the Contract Disputes Act, 41 U.S.C. § 604 (2006) (recodified at 41 U.S.C. § 7103). Veridyne cross-appeals the award of penalties. We reverse the Claims Court's quantum meruit award to Veridyne and affirm the award of penalties to the government under the False Claims Act and Contract Disputes Act.

## BACKGROUND

The contract in question was awarded pursuant to the Small Business Administration's ("SBA") 8(a) program. 15 U.S.C. § 637(a). This program is designed to help small, disadvantaged businesses. The program sets aside government contracts for businesses that are owned and controlled at least 51% by socially and economically disadvantaged individuals. To administer the program, the SBA contracts with federal agencies to provide goods and services, and subcontracts the actual performance of the work to disadvantaged businesses that have been certified by SBA as eligible for such contracts. Although the SBA has delegated the authority to negotiate with the SBA-qualified contractor to the Department of Transportation, and by extension, the Maritime Administration ("MARAD"), "the SBA is responsible for approving the resulting contract before award," and the formal contract is between the SBA and the SBA-qualified contractor. 48

C.F.R. ("FAR") §§ 19.808-1(c), *id.* 19.811-1(b). In June 1989, Veridyne, then Shepard-Patterson & Associates, Inc., was certified by the SBA for participation in SBA's 8(a) program. Veridyne's admission to the 8(a) program was for the standard nine-year term, and it was scheduled to "graduate" from the program in June 1998.

In March 1995, MARAD awarded to the SBA an indefinite delivery, indefinite quantity cost-plus-award-fee contract for services related to MARAD's logistics program. Later that month, the SBA awarded a subcontract containing the same terms as its contract with MARAD to Veridyne for one base year and up to four option years. The subcontract required Veridyne to provide services to MARAD "as needed in accordance with authorized written work orders." Pl.'s App'x ("P.A.") 10, 363. MARAD paid Veridyne $20,324,289.15 for the services performed under the initial contract period.

In late 1997 or early 1998, Veridyne approached MARAD about extending the contract. MARAD was satisfied with Veridyne's performance and preferred to work with Veridyne rather than switch to another SBA-qualified business. Veridyne wanted to extend the contract before Veridyne graduated from the 8(a) program in June 1998. At the time, if the new contract award price exceeded $3 million, it would be subject to open competition between SBA-qualified businesses and could not be awarded as a sole-source contract. 15 U.S.C. § 637(a)(1)(D)(i)(II). If MARAD opened the new contract to competition, the process would delay the award until after June 1998, *i.e.*, until after Veridyne's graduation from the program.

In March 1998, Veridyne submitted a proposal to MARAD for a new indefinite delivery, indefinite quantity, cost-plus-award-fee contract. Correspondence between Veridyne and MARAD before the submission specified

that estimates for the new contract would not exceed "$3,000,000 in the aggregate." P.A. 139. As a result, the "proposed" cost specified in the proposal, including the five additional option years, was $2,999,949.00. P.A. 171. The proposal specified that "[a]ll contract terms and conditions are the same, and the original scope and technical content remain intact [as the original contract]." P.A. 147. Veridyne's representative certified in the proposal that "to the best of [his] knowledge and belief, the cost or pricing data (as defined in [FAR] 15.801 . . . [*i.e.*, 'all the facts that can be reasonably expected to contribute to the soundness of estimates of future costs']) submitted . . . in support of [the new contract], are accurate, complete and current." P.A. 165 (citing FAR 15.801 (1994)). These statements were inaccurate. Veridyne well knew that the services to be provided under the extension would cost far in excess of $3,000,000, indeed, in excess of ten times that amount. P.A. 4. Veridyne even admitted that "the costs established in [the proposal] were never intended to reflect MARAD's actual needs, but were developed to meet SBA's $3 million limit." P.A. 36.

Similarly, although some MARAD officials did not believe that the $3,000,000 estimated cost represented the actual value of the services described in the proposal, other officials openly conceded that Veridyne had explicitly written the proposal "to remain within SBA's $3,000,000 threshold." P.A. 204. The Claims Court concluded that "MARAD personnel knew that the $3-million amount was merely a pretext to get around having to award [the new contract] subject to competition." P.A. 60; *see also* P.A. 11 ("MARAD contracting officials knowledgeable in approving the proposal vehicle and fully aware of the need to befog the SBA in order to obtain its approval actively participated in securing that approval.").

In April 1998, MARAD officials approved the new contract and submitted a letter to SBA proposing that SBA approve the new contract without opening it to competition. Although Veridyne's proposal was not sent to the SBA, MARAD's letter to the SBA included Veridyne's misleading data and figures taken directly from the proposal and noted that "[t]he statement of work is unchanged from the current contract" and "[t]he total estimated amount of this requirement is $3,000,000." Resp. to Panel Request, Attachment A at 2, May 7, 2014, ECF No. 73. In May 1998, MARAD, Veridyne, and the SBA executed the new contract extending the service contract, known as Modification ("Mod") 0023, which had been drafted by MARAD to reflect Veridyne's proposal.

By 1999, even though the stated cost of Mod 0023 was about $3,000,000, MARAD's projected internal logistics budget for the years covered by Mod 0023 and the final year of the original Contract was $35,974,779. The work orders issued to Veridyne far exceeded the scope of Mod 0023. From 2001 to 2004, MARAD issued additional work orders to Veridyne, Veridyne completed the work, and MARAD paid Veridyne $31,134,931.12 for this work. The government does not now seek to recover these payments.

In part due to MARAD's cost overruns, the Department of Transportation Office of Inspector General began investigating the execution of Mod 0023 in July 2003. By September 2004, the Inspector General concluded that Veridyne had obtained Mod 0023 through fraud. In October 2004, MARAD's Chief Counsel instructed MARAD officials that, "[e]ffective immediately, MARAD is to make no payments to Veridyne on any contract, without express approval by me." P.A. 337. MARAD did not notify Veridyne until December 2004, when MARAD issued a stop order suspending contract performance and informed Veridyne of its view that Mod 0023 was void *ab initio*. At the time of the December stop order, invoices

numbered 260–264 were outstanding to MARAD and had not been paid. After the stop order, Veridyne continued to do work for MARAD and submitted three additional invoices, numbered 265–267. MARAD never paid Veridyne the amounts invoiced in 260–267.

On June 13, 2005, Veridyne submitted invoices 260–267 as certified claims pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. § 604 (2006) (recodified at 41 U.S.C. § 7103). MARAD informed Veridyne that it would not issue a final decision on these claims because the matter involved allegations of fraud, and Veridyne treated this as a "deemed denial." 41 U.S.C. § 7103(f)(5). On February 28, 2006, Veridyne filed a complaint in the Claims Court to recover $2,267,163.96 on invoices 260–267, among other claims.

Insofar as is pertinent to this appeal, the government entered a defense under the Special Plea in Fraud statute, 28 U.S.C. § 2514, that Veridyne had forfeited its contract claim. In addition, the government counterclaimed for a civil penalty under the False Claims Act ("FCA"), 31 U.S.C. § 3729, for each fraudulent claim presented and for a penalty under the antifraud provision of the CDA, 41 U.S.C. § 604 (2006) (recodified at 41 U.S.C. § 7103), for the unsupported portion of Veridyne's CDA claims.

After a trial on the merits, the Claims Court rendered a somewhat confusing opinion. It concluded that because Veridyne's invoices contained false information, its direct contract claims were forfeited under the Special Plea in Fraud statute. But the Claims Court also concluded that because Veridyne had conferred a benefit on the government by performing the contract, it could recover in quantum meruit. The Claims Court determined that Veridyne was owed $1,068,636.22 in quantum meruit for the work performed before MARAD issued the stop order.

On the government's FCA counterclaim, the Claims Court concluded Veridyne's proposal for the Mod 0023 extension was a false claim. Because the Claims Court treated each invoice that Veridyne submitted under Mod 0023 as a separate false claim, each claim incurred an additional penalty under the FCA. The Claims Court imposed the maximum penalty of $11,000 per claim for each invoice submitted under Mod 0023, or 127 false claims. Thus, the government was awarded $1,397,000.00 in FCA penalties. The Claims Court also concluded that "[n]o evidence of record suggests that the SBA was aware that Mod 0023 was a pretext aimed at avoiding SBA's competition requirements." P.A. 60. Finally, the Claims Court found that Veridyne's CDA claims for invoices 265–267 were unsupported and concluded that the government was entitled to CDA damages in the amount of $568,802.09.[1]

The government appealed the Claims Court's quantum meruit award. Veridyne did not appeal the Claims Court's forfeiture finding on its direct contract claim. However, Veridyne cross-appealed the Claims Court's imposition of penalties under the FCA and the CDA. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3). We review legal conclusions of the Claims Court de novo and its factual findings for clear error. *Daewoo Eng'g & Constr. Co. v. United States*, 557 F.3d 1332, 1335 (Fed. Cir. 2009).

---

[1]    Veridyne asserted various other claims that were rejected, and Veridyne does not appeal. The Claims Court also rejected the government's common law fraud defense, and the government does not appeal.

DISCUSSION

I. VERIDYNE'S AFFIRMATIVE RECOVERY IN QUANTUM MERUIT

The Special Plea in Fraud Statute provides:

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment or allowance thereof.

In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514. To prevail under section 2514, the government must "establish by clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims." *Daewoo*, 557 F.3d at 1341 (quoting *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1362 (Fed. Cir. 1998)). The Claims Court found that Veridyne's affirmative contract claim was forfeited under section 2514. Veridyne does not appeal the forfeiture finding.

Even though the Claims Court found that Veridyne had forfeited its affirmative contract claim, it awarded quantum meruit recovery to Veridyne for the value of the services performed by Veridyne before MARAD's stop order. The Claims Court relied on *United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed. Cir. 1986), stating that "binding Federal Circuit precedent permits a contractor to recover for services already rendered where the situation does not involve a bribe or conflict of interest." P.A. 45; *see also* P.A. 38–39. On appeal, the government argues that it was improper for the Claims Court to allow Veridyne to recover in quantum meruit when its claims

have been forfeited under the Special Plea in Fraud Statute. We agree.

One of our predecessor courts, the Court of Claims, decided this issue in *Mervin Contracting Corp. v. United States*, 94 Ct. Cl. 81, 87 (1941). There, the court found that the contractor's claim was forfeited for fraud. *Id*. at 86. The court held that quantum meruit recovery was unavailable to the contractor, finding that the contract claim and the quantum meruit claim "were for the same services, and the claims for those services were forfeited, regardless of the theory or form in which the claims were asserted. The second causes of action in *quantum meruit* are therefore no more enforceable than the first causes of action based on the express contracts." *Id*. at 86–87. The Court of Claims in *Little v. United States* followed *Mervin*, recognizing that,"where, as in the present case, fraud was committed in regard to the very contract upon which the suit is brought, this court does not have the right to divide the contract and allow recovery on part of it." 152 F. Supp. 84, 87–88 (Ct. Cl. 1957).

The legislative history of the Special Plea in Fraud Statute confirms the correctness of the *Mervin* decision. The Special Plea in Fraud Statute was originally enacted as part of the Court of Claims Act in 1863, which expanded the jurisdiction of the Court of Claims to include "private claims against the Government, founded upon any law of Congress, or upon any regulation of an executive department, or upon any contract, express or implied, with the Government" and gave it the power to issue final judgments. Court of Claims Act of 1863, §§ 2–3, 12 Stat. 765, 765 (1863). One particular concern was that expanding the Court of Claims's jurisdiction would enable litigants to perpetrate fraud on the government. Vol. 32 pt. 2 Cong. Globe, 37th Cong., 2d Sess. 1671, 1672 (1862). In the floor debate, bill sponsors explained that the special plea provision was intended "to give [the claimants] to

understand by formal provision of law, that any attempt at fraud upon their part shall so taint their claim, *no matter whether there be equity in it or not*, as to forever forfeit it to the Government of the United States." *Id.* at 1674 (emphasis added).

Neither the *Amdahl* case, relied on by the Claims Court, nor *Miller v. United States*, 550 F.2d 17, 25–26 (Ct. Cl. 1977), cited by Veridyne, counsels an alternative result. In *Amdahl*, pursuant to the Brooks Act, Pub. L. No. 89-306 (codified as amended at 40 U.S.C. § 759 (1982)), the government procurement agency had delegated to the Department of Treasury the authority to procure computer equipment, and Treasury contracted with the Federal Home Loan Mortgage Corporation ("Freddie Mac") for this purpose. *Amdahl*, 786 F.2d at 390. But in doing so Treasury had violated the statute and regulation in two respects—it improperly paid for the equipment upon signing but before physical delivery and failed to determine whether suitable equipment was available from other sources. *Id.* at 391. Because Treasury had acted beyond the scope of its authority, we held that the contract was void, and Freddie Mac could not recover under an illegal contract. *Id.* at 392–93. However, we concluded that Freddie Mac could recover under quantum meruit for the services performed as an "innocent contractor." *Id.* at 395. There is no suggestion in *Amdahl* that quantum meruit recovery is available where the contract claim has been forfeited under a Special Plea in Fraud. To the contrary, *Amdahl* contemplated that quantum meruit recovery "may be different in a case involving fraud or the like, a matter not involved here." *Id.* at 395 n.8. Similarly, *Miller* did not address whether quantum meruit recovery was available for forfeited claims, but concluded that a contractor could obtain quantum meruit recovery because there was no fraud and the contractor

was only liable under the FCA on a negligent misrepresentation theory. 550 F.2d at 24.

Therefore, we reverse the Claims Court's award of $1,068,636.22 for quantum meruit recovery to Veridyne.

## II. THE GOVERNMENT'S FALSE CLAIMS ACT COUNTERCLAIM

Under the FCA, "[a]ny person who . . . knowingly presents" to the government "a false or fraudulent claim for payment or approval" "is liable to the United States Government for a civil penalty of not less than $5,000 and not more than [$11,000], plus 3 times the amount of damages which the Government sustains." 31 U.S.C. § 3729(a)(1), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461; *see also* 28 C.F.R. § 85.3. To recover under the FCA, the Government must show "(1) the contractor presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; (3) the contractor knew the claim was false or fraudulent; and (4) the United States suffered damages as a result of the false or fraudulent claim." *Young-Montenay, Inc. v. United States*, 15 F.3d 1040, 1043 (Fed. Cir. 1994). The government must establish a violation of the FCA by a preponderance of the evidence. 31 U.S.C. § 3731(d); *Daewoo*, 557 F.3d at 1340.

The Claims Court found that Veridyne's proposal to MARAD for the extension of the contract, the Mod 0023 proposal, was a false claim because it misrepresented the cost of the services that Veridyne agreed to provide in the proposal. The Claims Court awarded the government the maximum penalty for each of the 127 invoices submitted pursuant to Mod 0023 for a total penalty of $1,397,000.00.

Veridyne first argues that its proposal did not contain false statements because "the costs established in Modification 0023 were never intended to reflect MARAD's

actual needs." P.A. 36. We disagree. The original contract had covered all of MARAD's logistics needs and the language in the proposal indicated that Mod 0023 would have the same scope—that "[a]ll contract terms and conditions are the same, and the original scope and technical content remain intact." P.A. 147. In addition, Veridyne's representative had certified "to the best of [his] knowledge and belief, the cost or pricing data [in the proposal] (as defined in [FAR] 15.801 [*i.e.*, 'all the facts that can be reasonably expected to contribute to the soundness of estimates of future costs']) submitted . . . in support of [Mod 0023] are accurate, complete and current." P.A. 165 (citing FAR 15.801 & FAR 15.804-2 (1994)). The fact that this was an indefinite cost, indefinite quantity contract does not render the misrepresentations in Veridyne's proposal irrelevant. In light of the SBA's $3,000,000 threshold for awarding sole-source contracts, these misrepresentations were highly material. Therefore, the Claims Court did not err in finding that Veridyne's proposal meets the first criterion of the FCA of being a "false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

Second, Veridyne argues that even if the proposal contained false statements, Veridyne did not have the requisite intent to defraud MARAD because MARAD knew that these statements were false, relying on *United States ex rel Ubl v. IIF Data Solutions*, 650 F.3d 445, 452–53 (4th Cir. 2011), *United States. ex rel Durcholz v. FKW, Inc.,* 189 F.3d 542, 544–45 (7th Cir. 1999), *United States ex rel Hagood v. Sonoma County Water Authority*, 929 F.2d 1416, 1421 (9th Cir. 1991).

Although Veridyne may be correct that MARAD had knowledge that the Mod 0023 proposal contained false statements, the FCA inquiry does not end with MARAD's knowledge. Veridyne's contract was with the SBA, not with MARAD. And it is undisputed that "[n]o evidence of

record suggests that SBA was aware that the Mod 0023 proposal was a pretext aimed at avoiding SBA's competition requirements." P.A. 60. In other words, regardless of *MARAD's* knowledge, the *SBA* did not have knowledge that Veridyne's statements were fraudulent.

Even though the Mod 0023 proposal was never sent to the SBA, SBA was aware of and relied on the fraudulent cost data in the proposal. When MARAD requested permission from SBA for the extension of the Contract with Veridyne, it transmitted the false statements and figures from Veridyne's Mod 0023 proposal, stating that "[t]he total estimated amount of this requirement is $3,000,000" and assuring SBA that "[t]he acquisition for the incumbent [Veridyne] will be a follow-on or renewal contract with *no change* in the scope of work." Resp. to Panel Req., Attachment A at 2–3, May 7, 2014, ECF No. 73 (emphasis added). Even if Veridyne believed that MARAD officials were not misled by its proposal, it is clear that these false statements, certified as true by Veridyne, misled the SBA to enter the contract with Veridyne and that Veridyne intended that the SBA rely on the false statements. As a result, Mod 0023 was infected with fraud.

Third, Veridyne argues that even if the Mod 0023 proposal was procured by fraud, the invoices submitted pursuant to Mod 0023, on which the FCA penalties were based, did not contain any false statements and cannot support FCA penalties. Veridyne's contentions are unavailing. The Supreme Court has held that claims submitted pursuant to a fraudulently obtained contract are FCA violations even if the claims themselves do not contain false statements. *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543–44 (1943), *superseded by statute on other grounds as recognized by Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885, 1893–94 (2011). In *Marcus*, the electrical contractors, in obtaining

contracts with local governments that were funded by the federal government, used collusive bidding to obtain the contracts while certifying that these bids "were genuine." *Id.* at 540, 543 (internal quotation marks omitted). The contractors then drew checks from a joint federal and local government bank account to pay for the work. *Id.* at 543. Each check was treated as a separate claim. *Id.* Even though it was undisputed that the contractors had actually performed the contracted-for work, and these checks were not independently fraudulent, the initial fraud to obtain the contracts tainted all the claims. *Id.* at 543–44. The Supreme Court held that a contractor's "fraud [does] not spend itself with the execution of the contract. . . . The initial fraudulent action and every step thereafter taken pressed ever to the ultimate goal—payment of government money to persons who had caused it to be defrauded." *Id.* Because Mod 0023 was obtained by fraud, each invoice submitted pursuant to that contract was tainted by that fraud.[2] *See also United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352

---

[2]    Veridyne also relies on *United States v. Bornstein* for the proposition that each invoice should not constitute a separate penalty. 423 U.S. 303, 311–12 (1976). In *Bornstein*, even though the subcontractor United sent only *three* shipments of falsely marked tubes to contractor Model, Model incorporated those tubes into kits it shipped to the government and sent the government *thirty-five* invoices for payment. *Id.* at 307. The *Bornstein* Court distinguished *Marcus*, finding that United was only liable for the three false claims it had filed because the statute "penalizes a person for his own acts, not for the acts of someone else." *Id.* at 312. Here, *Bornstein* is inapplicable, as it is Veridyne and not another party that has submitted 127 tainted invoices to the government, and the statute penalizes that conduct.

F.3d 908, 920 (4th Cir. 2003) ("[T]he initial false certification by [the contractor] tainted all of the following invoices, and the district court properly determined that [the contractor] could be held liable on all twenty-six of the submissions by [the contractor] seeking government funding."); *United States ex rel. Alexander v. Dyncorp, Inc.*, 924 F.Supp. 292, 298 (D.D.C. 1996) ("It has been established that claims for payment submitted to the government pursuant to a fraudulently obtained contract violate the FCA, even if the claims themselves do not contain false statements.").

Veridyne also contends that these 127 invoices were only submitted to MARAD, not to the SBA, and therefore, these invoices were not sent to the contracting party. *Marcus* held it irrelevant that the contractors' false claims were made to the bank holding federal funds and not to the federal government directly; it is not necessary that the SBA be misled with respect to each of the 127 invoices. *Marcus*, 317 U.S. at 543–44. It is equally irrelevant here that Veridyne submitted its claims for payment to MARAD rather than the SBA directly, when the claims would be paid from federal funds.

We affirm the Claims Court's award of $11,000 for each FCA violation, or $1,397,000.00 for Veridyne's 127 false claims.

### III. THE GOVERNMENT'S CONTRACT DISPUTES ACT COUNTERCLAIM

The Contract Disputes Act requires that an authorized corporate official certify that "the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, [and] that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable." 41 U.S.C. § 605(c)(1) (2006) (recodified at 41 U.S.C. § 7103(b)(1)(A)–(D)). Under the antifraud

provision of the CDA, 41 U.S.C. § 604 (2006) (recodified at 41 U.S.C. § 7103(c)(2)),

> [i]f a contractor is unable to support any part of his claim and it is determined that such inability is attributable to misrepresentation of fact or fraud on the part of the contractor, he shall be liable to the Government for an amount equal to such unsupported part of the claim.

A "misrepresentation of fact" is "a false statement of substantive fact, or any conduct which leads to a belief of a substantive fact material to proper understanding of the matter in hand, made with intent to deceive or mislead." 41 U.S.C. § 601(9) (2006) (recodified at 41 U.S.C. § 7101(9)). "The government must establish this falsity and intent by a preponderance of the evidence." *Daewoo*, 557 F.3d at 1335. Congress enacted the fraud provision of the CDA "out of concern that the submission of baseless claims contributes to the so-called horsetrading theory where an amount beyond that which can be legitimately claimed is submitted merely as a negotiating tactic." *Id.* at 1340 (alterations in original omitted) (quoting S. Rep. No. 95-1118, at 20 (1978) *as reprinted in* 1978 U.S.C.C.A.N. 5235, 5254). Here, Veridyne's chief executive officer certified with respect to each claim that the claim was "made in good faith, that the supporting data [were] accurate and complete . . . , [and] that the amount requested accurately reflect[ed] the contract adjustment for which the contractor believe[d] the government was liable." 41 U.S.C. § 605(c)(1), (5) (2006) (recodified at 41 U.S.C. § 7103(b)(1)). The Claims Court found that invoices 265–267, where Veridyne billed for the work completed after MARAD's stop order, were unsupported.[3]

---

[3]   The Claims Court also found that these misrepresentations in invoices 265–267 would have supported FCA

MARAD relied on Veridyne's submitted invoices to show how funds for the Contract were allocated so that they could be paid. The Claims Court found that invoice 265 was unsupported because Veridyne misrepresented MARAD's own allocation of funds and falsely communicated to MARAD that MARAD had sufficient funds to pay invoice 265. Veridyne argues that it had no opportunity to confirm its fund allocation with MARAD because MARAD had stopped communicating with Veridyne before invoice 265 was submitted. But the failure of MARAD to communicate with Veridyne does not excuse Veridyne's conduct.

Veridyne's misrepresentations in invoices 266 and 267 are equally clear. A CDA claim requires a certification that the claimant has acted in good faith in claiming compensation for work performed. 41 U.S.C. § 605(c)(1) (2006) (recodified at 41 U.S.C. § 7103(b)(1)). In invoice 266, Veridyne charged MARAD its actual overhead rate, even though Veridyne had assured MARAD that it would only charge a "discounted" overhead rate, and had used that rate for the previous ten years. The Mod 0023 proposal also stated that

> [t]he overhead rate . . . is anticipated to be no greater than [the historic 64.5% overhead rate] in years 4 & 5 of the current contract vehicle . . . . For this current proposal, [Veridyne] will bid and cap the overhead rates at 64.4%, 62.5%, 61%, 58%, and 56% for Option Years 5, 6, 7, 8, and 9 respectively.

P.A. 147–48. Therefore, Veridyne was not entitled to payment at the higher overhead rate, and invoicing at that rate was a misrepresentation.

---

penalties, but declined to impose two penalties for the same claim.

In invoice 267, Veridyne had rebilled MARAD for previously unpaid expenses. But instead of making clear that the expenses were rebilled expenses, Veridyne included the rebilled lease expenses as part of overhead, making it difficult to identify these as twice-billed items. Therefore, while it is not unsupported to rebill for unpaid expenses, Veridyne's invoice could have induced the government to pay twice for the same expenses. Veridyne's invoicing violated the statute.

Finally, we consider whether a single claim can be the source of liability under both the FCA and the CDA, as the Claims Court found here. We have previously considered this question, and have held that the same false act in "[a] certified claim may be a source of liability under both the Contract Disputes Act and the False Claims Act." *Daewoo*, 557 F.3d at 1340–41 (citing *UMC Elecs. Co. v. United States*, 249 F.3d 1337, 1339–40 (Fed. Cir. 2001)); *Commercial Contractors*, 154 F.3d at 1375.

Therefore, we hold that the Claims Court did not err in finding that invoices 265–267 were unsupported, and affirm the Claims Court's award of $568,802.09 to the government as a CDA penalty.

CONCLUSION

We affirm the Claims Court's award of $1,965,802.09 to the government on its FCA and CDA counterclaims.[4] We reverse the Claims Court's award of $1,068,636.22 to Veridyne under a quantum meruit theory.

**AFFIRMED-IN-PART, REVERSED-IN-PART**

---

[4] Veridyne also argued that it relied on the advice of counsel in taking its actions with respect to Mod 0023 and in its actions with respect to invoices 265–267. We find no error in the Claims Court's rejection of this defense.

COSTS

Costs to the United States.