**TOYO MENKA KAISHA, LTD.**

v.

**The UNITED STATES.**

No. 427–76.

United States Court of Claims.

Decided May 16, 1979.

Edmund Pendleton, Washington, D. C., attorney of record, for plaintiff. Anderson, Pendleton, McMahon, Peet & Donovan, Washington, D. C., of counsel.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and SMITH, Judge.

## ON DEFENDANT'S MOTION TO DISMISS

## COUNTS I AND II OF THE PETITION

### AND

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

FRIEDMAN, Chief Judge:

This is an action for damages based upon the government's alleged breach of a contract to sell surplus rice to the plaintiff. The contract was awarded through competitive bidding. In a suit by an unsuccessful bidder, the district court held that the contract was invalid and enjoined the government from performing it. The plaintiff has moved for summary judgment, and the government has moved to dismiss the two counts of the petition charging breach of contract. We heard oral argument.

We deny the plaintiff's motion for summary judgment, grant the government's motion, reject as insubstantial a third claim in the petition asserting a taking of plaintiff's property for which just compensation is payable, and dismiss the petition.

### I.

The cessation of the Vietnamese War in 1975 found a number of cargoes of American agricultural commodities enroute to Indochina. To prevent these cargoes from being delivered to non-allies, the government seized them under the Foreign Assets Control Regulations. 31 C.F.R. §§ 500.-101–.809 (1975). Instructions were then issued to the agricultural attaches in the countries where these cargoes were stored to sell them promptly "as is, where is." Due to the perishable nature of these cargoes (and possibly from a desire to avoid legal claims from Vietnam), the sale was to occur as quickly as possible.

One of the cargoes so affected was a large quantity of rice, which was deflected to Guam. The agricultural attache in Manila, Glenn Sampson, was designated the contracting officer to sell this rice. Mr. Sampson was not a trained contracting officer but apparently had recently disposed of three other similarly deflected agricultural commodities without incident. The rice was to be sold on a formally advertised basis.

The American Embassy in Manila prepared and circulated an invitation for bids ("invitation") on the rice. The invitation contained a number of detailed "Terms and Conditions" of sale (see p. 1374 infra). It also stated, in conformity with regulations (see 41 C.F.R. §§ 1–2.301, 1–2.-404–2, 1–2.405 (1975)), that "Any oral statement or representation by any representa-

tive of the Government, changing or supplementing the Invitation or contract or any Condition thereof, is unauthorized and shall confer no right upon the Bidder or Purchaser," that modifications which made "the terms of the otherwise successful bid more favorable to the Government will be considered at any time [they are] received prior to award and may be accepted," and that the contract would be awarded "to that responsible Bidder whose bid conforming to the Invitation" was most advantageous to the government.

When these bids were opened on October 8, 1975,[1] plaintiff Toyo Menka Kaisha, Ltd.'s bid of $273,600 was highest, and the bid of $222,163 by Ambyth, Inc., was next highest. There is no dispute that Ambyth's bid conformed to the invitation; Toyo's bid, however, contained a number of conditions that varied from the invitation, and these variations led to the present dispute.

A. The invitation provided that the purchaser "must make all arrangements necessary for packing, removal and transportation of property," must load the property and must remove the property within 10 working days after the award. It further stated that the government would furnish "[n]o assistance" in loading. Toyo's bid, however, was conditioned upon (1) the government's arranging transportation (known as "fobbing") of the rice between the warehouse and the vessel Toyo would provide; (2) if the vessel were berthed in front of the naval warehouse, Toyo would pay the fobbing charges, which should be less than $5 per metric ton; (3) if the vessel were berthed at the more distant commercial port, Toyo would pay the actual fobbing charges of not more than $20.94 per metric ton; and (4) the government would pay the carrying charges, including any interest to November 20, 1975, with shipment to occur between October 20 and November 20.

B. The invitation stated that the rice was offered for sale "as is" and "where is," and that "the Government makes no warranty, express or implied, as to . . . its fitness for any use or purpose." Toyo's

bid provided: (1) the government was to guarantee that the rice was "surely for human consumption"; (2) the government was to assume the risk of rejection or other claim by "customs or other authorities" in Hong Kong, where Toyo planned to sell the rice; (3) Toyo's bid covered only "clean and sound bagged rice" and not "stained and/or cover tone [sic] bagged rice and/or bags for sweeping rice at warehouse or open yard up to the vessel"; and (4) the government was to bear the risk of any damage to the rice between its removal from the warehouse and its stowage on the vessel (though the invitation stated the price was to be "FOB warehouse Guam").

C. The invitation stated that the purchaser "shall pay all customs, duties, taxes and similar charges which may be levied by respective governments" against the purchaser and that the government would "not be liable for taxes, duties or other assessments imposed by any government . . . on any property transferred under this contract." Toyo's bid required the government to pay any export taxes or duties on the rice.

On the day the bids were opened, the contracting officer informed the Foreign Agricultural Service in Washington by Telex that Toyo had qualified its bid, and requested permission to accept the next highest bid if these qualifications could not be satisfactorily negotiated. The next day, October 9, the contracting officer sent a further telex to Washington which detailed every qualification in Toyo's bid, advised that Ambyth probably would protest if the contract were awarded to Toyo, and requested advice on how to proceed. Washington responded to the first telex (which did not detail Toyo's conditions) the following day, October 10. It directed the contracting officer to "make best effort to resolve problems [with Toyo] while remaining consistent with 'as is, whee [sic] is' and other IFB terms" but "if unable to complete Toyo Menka's sale, next high bid acceptable to FAS/W if bid conforms to IFB."

---

1. All dates refer to Manila time. Washington time is about one day earlier. Thus reference to October 9th is to Manila time, which would be October 8th, Washington time.

Following negotiations between the contracting officer or his assistant and Toyo, the latter agreed to drop those conditions to which the contracting officer objected. The Navy then indicated it wanted three new conditions in the contract: (1) the quantity of rice to be sold was to be increased from 1,800 tons to about 2,000 tons;[2] (2) Toyo must pay in advance the charges for moving the rice from the warehouse to onboard the vessel; and (3) the rice was to be moved on the naval base by the Navy's forwarder (which was similar, if not identical, to one of Toyo's original conditions, *supra*). Further negotiations ensued. Toyo agreed to these changes, but insisted that its liability for the cost of loading the rice onboard the vessel be limited to $5 per metric ton regardless of from which port the rice was loaded. (The district court found the cost of loading the rice would be $8.50 per metric ton at the naval pier and $34.41 per metric ton at the commercial port.)

On October 14, when all the disagreements had been resolved, the contracting officer advised Toyo's representative that he would not sign the contract until October 16. That representative nevertheless advised Toyo's home office on October 14 that final agreement had been reached. On the next day, but before the signing of the contract, Toyo signed an agreement to sell the rice to a Hong Kong buyer. On October 16, the contracting officer executed the contract in two steps: first he signed the purchase confirmation provided by Toyo, and later in the afternoon he signed the remaining contract documents. Prior to the signing of the latter, Ambyth told the contracting officer that it would file suit to void the contract with Toyo. Toyo claims it never knew of this impending suit.

Later on the same day (October 16), but after the contract had been signed, the contracting officer received from Washington a reply to the October 9 telex, which had detailed Toyo's original conditions and had warned of Ambyth's possible legal action. The reply stated: "Since Toyo Menka, the highest bidder, offered to buy subject rice with qualifications contrary to tender terms, you are hereby authorized to award the contract to the next highest bidder within the tender terms."

The contract signed on October 16 contained the following conditions that varied from the invitation: (1) the government was to pay all fobbing charges above $5 per ton; (2) Toyo's bid covered only clean and sound bagged rice; (3) the government was to state that the rice was fit for human consumption; (4) the government was to pay any export taxes or duties on the rice at Guam; (5) the Navy's forwarder was to be used if the vessel to carry the rice were berthed at the naval pier—otherwise a private forwarder would be used.

Following the October 16 signing, Toyo signed a charter contract for a ship to carry the rice from Guam to Hong Kong.

On October 20, Ambyth filed suit in the United States District Court for the Territory of Guam to void the award of the contract to Toyo. It named as defendant only the United States. Although Toyo's officer in charge of completing the contract voluntarily testified in the district court proceeding, neither the parties nor the court sought to make Toyo a party, and Toyo did not attempt to intervene.

After a trial on October 22 and 23, the district court held that Toyo's bid did not conform to the terms, conditions and specifications in the invitation and should have been rejected as nonresponsive. The court determined that the contract with Toyo was null and void *ab initio*, permanently enjoined the government from performing the contract and ordered that another invitation for bids be issued and that the rice be properly sold.

After new bids were submitted, the rice was resold on November 10 to Toyo for $403,000, which was $129,400 more than the price under the original contract.

In the present suit Toyo seeks damages based upon the government's alleged breach of either the contract signed on October 16 or a contract implied-in-fact that resulted from the course of dealings between Toyo and the government.

---

2. It was later discovered there were 2,134 tons of rice in the warehouse.

## II.

The parties have argued at length a number of contentions. The government's basic contention is that this suit constitutes an impermissible collateral attack upon the judgment of the District Court for Guam that held the contract null and void. Toyo responds that it is not bound by that judgment because it was not a party to that suit, and that because of Toyo's absence from the case, the district court lacked jurisdiction to determine the validity of the contract. On the merits, Toyo claims that its bid substantially conformed to the invitation, so that a valid contract resulted; and that in any event the government is estopped from asserting the invalidity of the contract. Alternatively, it argues that if the original contract was invalid, it may recover on a theory of *quantum meruit* based upon an implied-in-fact contract.

We find it unnecessary to resolve most of these contentions since we conclude (1) that the contracting officer had no authority to enter into the original contract because Toyo's bid was not responsive to the invitation, and (2) that since none of the expenditures Toyo made in anticipation of performing the original contract conferred in any benefits upon the United States, Toyo cannot recover in *quantum meruit.*

## III.

A. Where a government contract is awarded under competitive bidding, "deviations [from advertised specifications] may be waived by the contracting officer provided they do not go to the substance of the bid or work an injustice to other bidders. A substantial deviation is defined as one which affects either the price, quantity, or quality of the article offered." *Prestex Inc. v. United States,* 320 F.2d 367, 372, 162 Ct.Cl. 620, 627 (1963) (footnote omitted). *See also Mid-West Construction, Ltd. v. United States,* 387 F.2d 957, 961, 181 Ct.Cl. 774, 781 (1967); *Albano Cleaners, Inc. v. United States,* 455 F.2d 556, 559, 197 Ct.Cl. 450, 455 (1972). *Cf. United States v. Ellicott,* 223 U.S. 524, 32 S.Ct. 334, 56 L.Ed. 535 (1912). Federal Procurement Regulations incorporate these principles.[3]

When the issue of the "responsiveness of the accepted bid arises after the award, the court should ordinarily impose the binding stamp of nullity only when the illegality is plain" and should "uphold the award unless its invalidity is clear." *John Reiner & Co. v. United States,* 325 F.2d 438, 440, 163 Ct.Cl. 381, 386, 387 (1963), *cert. denied* 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964) (footnote omitted). On the other hand, the government

3. Those regulations specify the standards for determining whether a bid should be rejected because of substantial deviation from the terms of the invitation for bids. Section 1–2.404–2(a), set forth in 41 C.F.R., provides that "[a]ny bid which fails to conform to the essential requirements of the invitation for bids, such as specifications, delivery schedule, or permissible alternates thereto, shall be rejected as nonresponsive." It states that "[o]rdinarily, a bid shall be rejected where the bidder imposes conditions which would modify requirements of the invitation for bids or limit his liability to the Government so as to give him an advantage over other bidders." It also states that a low bidder may be requested to delete from its bid objectionable conditions that "do not go to the substance, *as distinguished from the form of* the bid," and that a condition goes to the substance of the bid "where it affects price, quantity, quality, or delivery of the items offered." 41 C.F.R. 1–2.404–2(b) (1975). Section 1–2.405 permits the disregarding of "minor informalities or irregularities," which are those the "sig-

nificance [of which] as to price, quantity, quality, or delivery *is trivial or negligible* when contrasted with the total cost or scope of the supplies or services being procured." It gives as examples of such defects the bidder's failure to return the appropriate number of copies of his bid, or his failure to furnish required information concerning the number of his employees. 41 C.F.R. § 1–2.405 (1975).

In terms, these regulations apply to procurement rather than to disposal of property, which the present case involves. The general government regulations covering the disposal of personal property provide that except for negotiated sales "property shall be sold by competitive bid sale after advertising." 41 C.F.R. § 101–45.304–1 (1975). Since the Federal Procurement Regulations reflect fundamental policies regarding the letting of government contracts involving personal property, it is appropriate to draw upon them in determining the governing requirements when government property is "sold by competitive bid sale after advertising," as was done in this case.

may disclaim a contract on the ground of voidness *ab initio* because of the nonresponsiveness of the bid. Where a public contract is to be let pursuant to formal advertising, the strictures upon defendant's contracting agent are such "that the contract awarded must be the contract advertised and \* \* \* if it is not, the Government is not bound, since defendant's contracting agent could not bind the Government beyond his actual authority." *Prestex Inc. v. United States*, 320 F.2d 367, 371, 162 Ct.Cl. 620, 625 (1963). *Albano Cleaners, Inc. v. United States, supra*, 455 F.2d at 559, 197 Ct. Cl. at 455. In these circumstances "the Government is not estopped to deny the limitations on [the contracting officer's] authority, even though the private contractor may have relied on the contracting officer's apparent authority to his detriment, for the contractor is charged with notice of all statutory and regulatory limitations." *Prestex Inc. v. United States, supra*, 320 F.2d at 371, 162 Ct.Cl. at 625 (footnotes omitted).

 These principles rest upon and effectuate important public policies. "Rejection of irresponsive bids is necessary if the purposes of formal advertising are to be attained, that is, to give everyone an equal right to compete for Government business, to secure fair prices, and to prevent fraud." *Prestex Inc. v. United States, supra*, 320 F.2d at 372, 162 Ct.Cl. at 626 (footnote omitted). The requirement that a bid be responsive is designed to avoid unfairness to other contractors who submitted a sealed bid on the understanding that they must comply with all of the specifications and conditions in the invitation for bids, and who could have made a better proposal if they imposed conditions upon or variances from the contractual terms the government had specified. The rule also avoids placing the contracting officer in the difficult position of having to balance the more favorable offer of the deviating bidder against the disadvantages to the government from the qualifications and conditions the bidder has added. In short, the requirement of responsiveness is designed to avoid a method of awarding government contracts that would be similar to negotiating agreements but which would lack the safeguards present in either that system or in true competitive bidding. *See* R. Nash & J. Cibinic, Federal Procurement Law, 260 (3d Ed. 1977).

 Responsiveness is determined by reference to the bids when they are opened and not by reference to subsequent changes in a bid. *Id.* at 261. Allowing a bidder to modify a nonresponsive bid when, upon opening the bids, it appears that the variations will preclude an award, would permit the very kind of bid manipulation and negotiation that the rule is designed to prevent. Otherwise bidders would be encouraged to submit nonresponsive bids on terms favorable to the government but subject to certain conditions, in the hope that if their bids were the top ones, they could then negotiate about and retain some of their proposed changes. In this way they could obtain a contract that they could not have received had they complied with the specification in the invitation for bids.

 We therefore conclude that if Toyo's original bid deviated so substantially from the invitation with respect to price, quantity or quality that it materially changed the terms of the government's offer, the contracting officer had no authority to award the contract to Toyo but should immediately have rejected it as nonresponsive. As we now show, Toyo's bid contained these fatal flaws.

B. The conditions Toyo attached to its bid made such significant changes in price, quantity and quality, to the prejudice of the other bidders, that the bid was nonresponsive, and the ensuing contract therefore was void.

1. *Price.*

(a) Although the invitation stated that the purchaser was responsible for removing, loading and transporting the rice, Toyo's bid provided that it would pay no more than $5 per ton for fobbing charges if the rice were loaded from the naval pier, and no more than $20.94 in loading charges if the rice were loaded from a commercial pier.

The district court found that the cost of loading rice at the commercial pier would be $34.41 per ton. The effect of Toyo's condition was that if the rice were loaded from a commercial pier, Toyo's expenses would have been about $28,300 less than those of the competing bidders. This represented more than one-half of the difference of $51,437 between the bids of Toyo and Ambyth. Moreover, under the contract actually signed, Toyo's limitation on the charges it would pay for fobbing enabled it to exceed Ambyth's bid by over $62,000.

Toyo argues that the invitation was unclear whether loading would be done from the naval or the commercial pier and that it was required to impose these conditions to protect itself from the higher expenses it would incur if it had to load at the commercial pier. Ambyth, however, was in the same predicament, yet its bid did not include such a condition to deviate from the terms of the invitation. If the identity of the pier to be used was critical to the amount of Toyo's bid, it could have submitted alternative bids, the higher to apply if the naval pier were used and the lower to govern if the rice was loaded from a commercial pier. Cf. *John Reiner & Co. v. United States, supra,* 325 F.2d at 441–42, 163 Ct.Cl. at 389.

(b) Toyo required the government to pay all export taxes and duties on the rice at Guam. The invitation, however, stated that the purchaser, not the government, would pay "all customs, duties, taxes, and similar charges . . . ."

### 2. *Quality and Quantity.*

We consider these two factors together since the requirements Toyo imposed with respect to quality also affected the quantity of rice the contract would cover.

The invitation provided that the rice would be sold "as is" and that the government made no warranty concerning "its fitness for any use or purpose." Toyo's bid, however, required the government to guarantee that the rice was fit for human consumption and to assume the risks that the rice might be rejected by Hong Kong authorities. Moreover, the bid covered only

"clean and sound bagged rice." The effect of these conditions was to except from Toyo's obligation under the contract any rice that was defective or might be rejected in Hong Kong or that might be difficult to load because not properly bagged. This limitation could have resulted in a significant reduction in the amount of rice the contract was to cover. It also would have given Toyo a more favorable arrangement than the other bidders who, by accepting the rice "as is," as the invitation required, assumed the risk that some of it might not be disposable or might be more expensive to ship because of improper bagging.

■ C. As noted (*supra* p. 9), the responsiveness of a bid is determined when the bids are opened and not on the basis of subsequent changes made in the bid before the contract is signed. In the present case, however, even if responsiveness were judged in the light of the changes made in the contract as executed, the bid as thus amended still would be unresponsive. We have pointed out (*supra* pp. 5–6) that the contract signed on October 16 contained five material variations from the invitation. These deviations largely followed the conditions Toyo originally had imposed.

One of them may have been even more onerous to the government than the earlier proposal. Toyo originally had stated that it would pay fobbing charges of no more than $5 per ton if the rice were shipped from the naval pier and of no more than $20.94 if the commercial pier were used. The contract ultimately signed did not contain the latter qualification but provided only that the government was to pay all fobbing charges above $5 a ton. Thus, under the contract, apparently the government would have had to pay the difference between $5 and the $34.41 the district court found would be the cost of loading at the commercial pier, or $29.41. For the 2,134 tons of rice the contract covered, this would have totaled $62,760, or approximately $11,300 more than the difference between Toyo's and Ambyth's bids.

D. The government's own actions in this case confirm that Toyo's bid was not re-

sponsive. The contracting officer's first message to Washington merely stated that Toyo had qualified its bid and requested authority to accept the next highest bid if these qualifications could not be negotiated. Washington agreed to such negotiations, provided that any sale to Toyo would be "consistent with" the "as is" provision and other terms of the invitation. Washington also stated that if the contracting officer could not complete the sale to Toyo, the next highest bid would be acceptable if it conformed to the invitation. At that point, the instructions from Washington apparently assumed that Toyo's conditions were not substantial deviations from the invitation.

The day after the bids were opened, the contracting officer furnished the details of Toyo's conditions to Washington. A week later, Washington responded that because Toyo's bid contained "qualifications contrary to tender terms," the contracting officer could award the contract to the next highest bidder. Although this latter response was received by the contracting officer only after he had signed a contract (but on the same day), it reflects the government's own recognition that the conditions Toyo had imposed constituted sufficiently substantial deviations from the invitation to make Toyo's bid nonresponsive.

### IV.

A. Alternatively, Toyo contends that if the contract was invalid, it may recover for breach of a contract implied-in-fact. It argues that it is entitled to damages measured by the additional amount the government received when the rice was resold or, at least, the amount Toyo expended in anticipation of performing the original contract.

The problem with Toyo's argument on this branch of the case is that because the contracting officer had no authority to enter into the contract on the terms Toyo demanded, there was no implied-in-fact contract. None of the expenses that Toyo incurred after it signed the first contract on October 16 in anticipation of performing it were for goods or service that inured to the benefit of the government. The government gained nothing as a result of Toyo's

arranging for a ship to transport the rice to Hong Kong, its signing of a contract to sell the rice there, or any incidental expenses Toyo may have incurred in making those arrangements.

Nor was Toyo responsible for the additional amount the government received upon the second sale of the rice. The second sale resulted not from anything Toyo did but from the successful lawsuit Ambyth brought to enjoin performance of the original contract. Although the end result of that suit was an increase of $129,400 in the amount the government obtained upon sale of the rice, Toyo did nothing that would entitle it rather than the government to that amount.

B. Finally, Toyo contends that the cancellation of the original contract by the district court constituted a taking of its property by the government for which it is entitled to just compensation. Since the property that Toyo asserts was taken was its interest in the contract, our holding that the contract was invalid eliminates the basis for that claim.

Plaintiff's motion for summary judgment is denied, the defendant's motion to dismiss is granted, and the petition is dismissed.