CROMAN CORPORATION, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 94–48C.

United States Court of Federal Claims.

Aug. 16, 1994.

Scott W. Horngren, Portland, OR, for plaintiff.

Lisa B. Donis, Dept. of Justice, with whom was Asst. Atty. Gen. Frank W. Hunger. Roger W. Nesbit, U.S. Dept. of the Interior, of counsel.

## OPINION

MEROW, Judge.

This case is before the court on plaintiff Croman Corporation's motion for summary judgment and on defendant United States' cross-motion for summary judgment. Plaintiff brings this action pursuant to 28 U.S.C. § 1491(a)(3), which grants the Court authority to enter declaratory judgments and to provide equitable relief in pre-award cases. Croman seeks to invalidate the recent action of the Department of Interior's Bureau of Land Management (BLM) reappraising and increasing the price of a timber sale originally bid in 1990. Plaintiff contends that the defendant breached its obligation to treat its bid fairly.

Defendant cross-moved for summary judgment asserting the following: 1) Plaintiff has not met its burden of showing that the government breached its duty of good faith and fair dealing, 2) The Government did not violate any law in reappraising the timber sale, 3) The government's decision to reappraise the sale was reasonable, and, 4) The reappraisal does not contradict the intent of Section § 318 of the Department of Interior and Related Agencies Appropriations Act for Fis-

cal Year 1990, Pub.L. No. 101–121 § 318, 103 Stat. 701, 745.

A hearing on the motions was held on August 4, 1994. After consideration of the merits of each party's contentions, and after a review of the motions, oppositions, and supporting memoranda, plaintiff's motion is granted, in part.

### FACTS

On June 22, 1990, the Fish and Wildlife Service of the United States Department of the Interior ("FWS") announced that, pursuant to the Endangered Species Act, 16 U.S.C. § 1532, the northern spotted owl would be listed as a threatened species. The listing became effective on July 23, 1990.[1]

On August 1, 1990, the Bureau of Land Management of the United States Department of the Interior ("BLM"), Medford, Oregon, issued a Timber Sale Notice for the August 30, 1990 sale of twelve sites, including the Hoxie Griffin site, which is at issue in this case. The sale was set aside for purchase by small businesses. The sale notice included the following provision, which acknowledged the risk that consultation over the northern spotted owl could result in a delay in award or in the rejection of the bids:

SALE EFFECTS OF OWL LISTING. On June 22, 1990, the U.S. Fish and Wildlife Service announced a decision to list the northern spotted owl as a threatened species. This listing became effective on July 23, 1990. The bids on timber sales offered in this notice may be rejected or the sale award delayed as a result of recommendations received through the formal consulta-

tion process with the U.S. Fish and Wildlife Service to adequately protect the northern spotted owl. The formal consultation process is required by section 7 of the Endangered Species Act of 1973 for threatened or endangered species.[2]

The prospectus for the Hoxie Griffin sale contained the same spotted owl provision as the timber sale notice.[3] The sale contained 2,809 thousand board feet of harvestable timber.[4] The required bid deposit was $61,300.00.[5] The sale was held on August 30, 1990. Croman Corporation submitted a bid for $612,644 and was determined to be the highest bidder.

Since late 1990, BLM and FWS have been involved in consultations regarding the impact of the Hoxie Griffin sale on the northern spotted owl and its critical habitat pursuant to the consultation provisions of the Endangered Species Act, 16 U.S.C. § 1536. Consultation began for all fiscal year 1990 timber sales as a group to assess their impact on the northern spotted owl. On November 23, 1990, FWS issued a final biological opinion stating that the 157 sales submitted for consultation as part of the "Section 318 Program"[6], which included the Hoxie Griffin sale, would not jeopardize the existence of the northern spotted owl.[7] Critical habitat had not yet been proposed for the spotted owl and was not subject to this biological opinion.[8] The opinion also provided an "incidental take statement" protecting BLM and Croman from liability for "taking" an owl under ESA § 9 in the event an owl was incidentally taken as a result of timber harvest.[9]

---

1. D.App. at 1. "D.App." refer to the appendix of exhibits submitted with defendant's cross-motion for summary judgment filed June 8, 1994. "Horngren Ex." and "Cross Ex." refers to appendices filed on March 9, 1994 with plaintiff's motion for summary judgment.

2. D.App. at 5.

3. D.App. at 10.

4. D.App. at 6.

5. D.App. at 6.

6. Pub.L. No. 101–121 § 318, 103 Stat. 701, 745. *See infra.* p. 9.

7. Horngren Ex. I.

8. Horngren Ex. I at 2.

9. Horngren Aff. I at pp. 4–8. Section 9 of the ESA and applicable regulations prohibit the "taking" of a listed endangered species without special exemption. The term "taking" is defined in the ESA as, "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Under ESA §§ 7(b)(4) and 7(o)(2), taking that is incidental to, and not the purpose of, the agency action is not considered prohibited taking within the bounds of the ESA, provided that such taking is in compliance with the terms and conditions of the incidental take

On December 14, 1990, BLM sent a letter to Croman indicating that FWS recommended not awarding the Hoxie Griffin timber sale at that time.[10] The letter also stated the following:

> We have chosen to reinstate consultation with the FWS on this sale. However, we have been advised that this may take up to six months to complete. If you do not wish to wait for the results of the reconsultation, we will return the bid bond to you and plan to reoffer the tract after reconsultation. In the event you wish to wait for the reconsultation results, you will still have the option of declining the award at that time.

> Please be aware that the contracting officer will, at that time, consider whether it is in the best interest of the government to award the sale to you or to reoffer the tract. This decision will depend on the scope of changes to be made in the original sale and the current market conditions.[11]

On March 20, 1991, BLM submitted the Hoxie Griffin timber sale for consultation as an individual action. FWS issued a final biological opinion on September 19, 1991, again finding that the Hoxie Griffin timber sale would not jeopardize the northern spotted owl population.[12] On October 30, 1991, BLM sent the final biological opinion to Croman and explained that the timber sale would be clear for award but for informal conferencing between BLM and FWS to examine the effects of the Hoxie Griffin sale on proposed spotted owl critical habitat. The letter read in relevant part:

> You have been declared the high bidder for the following non-jeopardy sale:

| Timber Sale Name and Contract No. | Sale Date: |
|---|---|
| Hoxie Griffin OR110–TS90–016 | August 30, 1990 |

As a prospective purchaser, you are considered an applicant under the Endangered Species Act and as such are entitled to become involved in the consultation process. The biological opinions are enclosed for your review. Under the guidelines of the final biological opinions, the Hoxie Griffin timber sale would be clear for award. However, it has been determined to be located in a proposed critical habitat unit for the northern spotted owl which requires that sale to be informally conferenced prior to award of the contract.

> \* \* \* \* \* \*

> Under contract law principles, in order for us to bind you to your bid, the offer must have been accepted within a reasonable amount of time. This amount of time has been defined in the Uniform Commercial Code as usually 90 days. Since your sale has been sold-unawarded for more than 90 days, you may withdraw your bid and have your bid deposit returned if you so desire.[13]

The BLM and FWS never completed informal conferencing before finalizing its designation of critical habitat on January 15, 1992. The FWS required BLM to submit a formal request for consultation on critical habitat. Formal consultation on critical habitat began in April 1992. A final biological opinion was issued on September 3, 1993 in which FWS issued a "no-jeopardy" determination for the fiscal year 1990 timber sale program. The opinion concluded that certain sales could be awarded with modifications necessary to avoid adverse effects on the spotted owl critical habitat.[14]

On January 14, 1994, BLM sent Croman an award letter stating that the sale would be awarded consistent with the FWS recom-

statement. "Incidental take" is defined as taking that results from, but is not the purpose of, carrying out an otherwise lawful activity conducted by the federal agency or applicant. 50 C.F.R. § 402.2. Exemption of federal actions from incidental take of spotted owls under ESA § 7 must pass two tests: 1) the anticipated level of take must not violate § 7(a)(2) by being likely to jeopardize the continued existence of the owl, and 2) taking that occurs must be in compliance with the terms and conditions specified in the written incidental taking statement included in

the final biological opinion as directed by § 7(o)(2).

10. D.App. at 15.

11. Id.

12. Horngren Ex. C.

13. Cross Ex. B at 1.

14. Horngren Ex. E.

mendations in its final biological opinion for harvesting and for modifications.[15] Croman was given until March 15, 1994 to accept the offer.[16] In order to comply with the FWS recommendations, BLM reduced the volume of timber in the Hoxie Griffin sale by approximately one third, from 2,809,000 board feet to 1,917,000 board feet and 12 other substantive changes were made to the sale.[17] Market timber prices increased between 1990, the year in which the Hoxie Griffin timber sale was held, and 1994, the year it was to be awarded. The Hoxie Griffin timber sale was reappraised and, as a result, BLM proposed an increase in the total price of the sale from Croman's bid price of $612,000 to $807,448. The average price of the sale thus would increase from $218 per thousand board feet to $421 per thousand board feet. BLM made the award of the Section 318 timber sales contingent on acceptance of the necessary modifications.[18]

The re-offer of the timber sale with modifications was made only to Croman as the original high bidder. BLM concluded that, because the Hoxie Griffin timber sale had been authorized pursuant to Section 318 of the Fiscal Year 1990 Interior Appropriations Act[19], which effectively represented the only

timber available for sale in the Pacific Northwest, there was compelling justification to first make the offer to award the sale to Croman.

On January 25, 1994, Croman requested an additional 30 days to respond to the January 14, 1994 award offer letter.[20] Both parties have since agreed to extend the deadline for acceptance of the award at least through the end of the current month.

On January 26, 1994, Croman filed a complaint in this Court seeking declaratory and injunctive relief. Croman seeks a declaration that BLM has acted arbitrarily and capriciously in raising the price of the Hoxie Griffin timber sale in breach of its implied contractual obligation of good faith and fair dealing. Croman also seeks a judgment declaring that award of the timber sale be made at the original 1990 bid price rather than the 1994 reappraised value.

## DISCUSSION

### I. Pre–Award Jurisdiction

■ Pre-award contract claim jurisdiction in this court depends upon the existence of an implied-in-fact contract requiring fair and honest consideration of responsive bids

15. Cross Ex. D.; D.App. at 18–22.

16. D.App. at 31.

17. D.App. at 16–17, 18–22.

18. The September 15, 1993 internal BLM Instruction Memorandum No. OR–93–188 states in relevant part:
> The award of these Section 318 timber sales will be contingent on the purchaser accepting the necessary modifications. Bureau Manual Policy in 5470—*Contract Modification-Extension-Assignment*, provides that the Contracting Officer may not entertain any modifications that would significantly alter the bidding base for advertised sales or generate financial windfalls to the purchaser *without strong compelling justification together with compensating benefit to the Government.* (emphasis added) Also, contract modifications must be bilateral, agreed to in writing by the Contracting Officer and the purchaser.
> We have studied the issues involved with these timber sales and determined that there is compelling justification to award the contracts contingent on the acceptance of the modifications. The log supply shortage in western Oregon and the public policy directive in Section 318 of the

Interior Department Appropriations Act for Fiscal Year (FY) 1990 under which these sales were originally offered are compelling justification to complete the award of these sales contingent on modification. Dropping these sales from the FY 1990 timber sale volume would worsen the timber supply crisis which Congress was attempting to alleviate. These FY 1990 timber sales are not included in the current court injunctions prohibiting award of timber sale contracts, and may be the only significant timber volume added to BLM timber under contract this year.
> To meet the intent for "compensating benefit to the Government," all changes in costs and timber values should be made as may be appropriate. This should result in a contract price which is fair to the public and allow for a fair profit to the purchaser. At the same time, the adjusted contract price should benefit the Government because the timber tracts will be reappraised to current market conditions.
> Horngren App. at F.

19. Pub.L. No. 101–121, 103 Stat. 701, 745–50 (1989).

20. Horngren App. at G.

solicited by the government. *United States v. Grimberg Co.*, 702 F.2d 1362, 1367 (Fed. Cir.1983). The subject matter jurisdiction over a claim alleging breach of an implied contract to consider a responsive bid fairly and honestly rests in 28 U.S.C. § 1491(a)(1). 28 U.S.C. § 1491(a)(3) empowers this court to grant declaratory judgments and equitable relief in order "to afford complete relief on any contract claim brought before the contract is awarded."

 The scope of review of agency pre-award procurement actions is limited. *Bean Dredging Corp. v. United States*, 22 Cl.Ct. 519, 522 (1991). The question to resolve is whether the procurement official had a rational or reasonable basis for the determination. *Rockwell Intern. Corp. v. United States*, 4 Cl.Ct. 1, 3 (1983); *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983). The court should intervene only when it is demonstrated that the agency's determinations were irrational or unreasonable. *Bean Dredging Corp. v. United States*, 22 Cl.Ct. at 522; *Caddell Const. Co. v. United States*, 7 Cl.Ct. 236, 241 (1985); *Baird Corp. v. United States*, 1 Cl.Ct. at 664. The plaintiff must show the lack of a reasonable basis for the contracting officers decision or that the procurement procedure involves a clear and prejudicial violation of the applicable statute or regulations. *Keco Industries, Inc. v. United States*, 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203–04 (1974); *Olympia USA, Inc. v. United States*, 6 Cl.Ct. 550, 554 (1984). When dealing with advertised bidding, the conduct of the procurement is subject to stricter standards than would be the case if negotiated procurement is authorized. *Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 65, 617 F.2d 590, 597 (1980).

## II. *Section 318 Timber Sales, Generally*

 The Hoxie Griffin timber sale was offered pursuant to Section 318 of the De-partment of Interior and Related Agencies Appropriation Act for FY 1990, Pub.L. No. 101–121 § 318, 103 Stat. 701, 745. Section 318 was designed to strike a balance between the need to protect the northern spotted owls with the need to avoid economic calamity in western Oregon and Washington from reduced timber sales caused by court injunction. The Act was designed to move timber into the market quickly and provide for rapid resolution of challenges to halt Section 318 timber sales. No restraining order or preliminary injunction could be entered by any court in response to challenge of a decision to prepare, advertise, offer, award, or operate a timber sale sold pursuant to Section 318. *Id.* at § 318(g)(1), 103 Stat. at 749.

## III. *BLM Actions lack a rational basis in that the 1994 Re–Offer to Croman was Unauthorized*

 This case is unique because, unlike other pre-award contract disputes before this court, the contract here has already been offered to the plaintiff. BLM now offers the award of a timber sale contract, which was originally offered to plaintiff in 1990 under significantly different terms, contingent on the purchaser accepting the new modifications. Under the applicable regulations, BLM either had to award the contract to Croman, who was the highest qualified and responsible bidder, or reject all bids. *See* 43 C.F.R. § 5450.1.[21] Instead of explicitly cancelling the 1990 offer of award, the defendant implicitly cancelled it by unilaterally modifying essential terms of the contract and making the award contingent upon acceptance of these terms. The 1994 "re-offer" to Croman is essentially a new proposal for the sale of timber and, as the agency failed to offer the sale through a competitive advertised pro-

---

21. This provision reads in relevant part:

**§ 5450.1 Preaward qualifications of high bidder.**

(a) The authorized officer may require the high bidder to furnish such information as is necessary to determine the ability of the bidder to perform the obligations of the contract. *The contract shall be awarded to the high bidder, unless* he is *not qualified or responsible, or unless all bids are rejected.* If the high bidder is not qualified or responsible or fails to sign and return the contract together with the required performance bond and any required payment, the contract may be offered and awarded for the amount of the high bid to the highest of the bidders who is qualified, responsible, and willing to accept the contract.
43 C.F.R. § 5450.1(a) (emphasis added).

curement as required by the regulations, it is unauthorized and invalid.

### A. 1994 Re–Offer by BLM was New Offer for Sale of Timber

The BLM modifications changed the sale as offered in 1990 to such an extent that a new re-offer was required in 1994. Counsel for defendant stated during the August 4, 1994 hearing that, in effect, the 1990 Hoxie Griffin timber sale offer no longer exists because of the reduction in timber volume and price reappraisal resulting in a "re-offer" to plaintiff in 1994. BLM "re-offered" the timber sale only to plaintiff because, defendant explained, the Hoxie Griffin timber sale was part of the Section 318 sales and due to the long consultation process required under the ESA, BLM believed there was a compelling justification to re-offer the sale, with FWS required modifications, only to the 1990 high bidder.

 By unilaterally decreasing the quantity and increasing the price of the sale which it will accept, the defendant has implicitly rejected plaintiff's original bid by making a counter-offer for the Hoxie Griffin sale. BLM's re-offer substantially deviated from the terms of the 1990 contract and from the original advertised specifications. "Where a government contract is awarded under competitive bidding, 'deviations [from advertised specifications] may be waived by the contracting officer *provided* they do not go to the *substance of the bid* or work an injustice to other bidders. A *substantial deviation* is defined as one which affects either *price, quantity* or quality of the article offered.'" *Toyo Menka Kaisha, Ltd. v. United States,* 220 Ct.Cl. 210, 218, 597 F.2d 1371, 1376 (1979)[22] (emphasis added), *citing, Prestex Inc. v. United States,* 162 Ct.Cl. 620, 627, 320 F.2d 367 (1963) (other citations omitted).[23] "Where a public contract is to be let pursuant to formal advertising, the strictures upon defendant's contracting agent are such that 'the contract awarded must be the contract advertised and * * * if it is not, the Government is not bound, since defendant's contracting agent could not bind the Government beyond his actual authority.'" *Toyo Menka Kaisha, Ltd. v. United States,* 220 Ct. Cl. at 219, 597 F.2d at 1377, *citing Prestex Inc. v. United States,* 162 Ct.Cl. at 625, 320 F.2d 367. Although *Toyo Menka Kaisha* concerns pre-award modifications by a bidder that go the "substance of the bid", it is clear from the holding in that case that any pre-award modifications by the government that substantially deviate from the original advertised sale in terms of price, quantity and quality require a new invitation for bids.

---

**22.** In *Toyo Menka Kaisha, Inc. v. United States,* the plaintiff sought damages based upon, among other things, the Government's alleged breach of a competitively bid contract to sell to plaintiff surplus rice deflected to Guam upon cessation of the Vietnam War in 1975. Plaintiff was the high bidder but qualified its bid in several substantial respects. Following negotiations, plaintiff dropped the qualifications. However, the contract as signed contained five substantial deviations from the invitation. The second highest bidder filed suit in the United States District Court in Guam to void the award. The court held the contract void *ab initio* because the accepted bid did not conform to the terms, conditions and specifications in the invitation for bids and that it should have been rejected as nonresponsive. The district court permanently enjoined the government from performing the contract and ordered that another invitation for bids be issued so that the rice may be properly sold. The Court of Claims held, *inter alia,* that the contracting officer had no authority to enter into the original contract because plaintiff's bid was nonresponsive to the invitation.

**23.** The Federal Procurement Regulations incorporate the principle that condition as to price, quantity or quality of item sold goes to the substance of the bid. *See e.g.,* 41 C.F.R. 1–2.404–2(b) (low bidder may be requested to delete from its bid objectionable conditions that "do not go to the substance, as distinguished from the form of the bid" and that a condition goes to the substance of the bid "where it affects price, quantity, quality or delivery of the items offered"). The FPRs apply to the procurement rather than the sale of property by the government. The general government regulations covering the disposal of personal property provide that except for negotiated sales "property shall be sold by competitive bid sale after advertising." 41 C.F.R. § 101–45.304–1. "Since the Federal Procurement Regulations reflect fundamental policies regarding the letting of government contracts involving personal property, it is appropriate to draw upon them in determining the governing requirements when government property is 'sold by competitive bid sale after advertising' ...." *Toyo Menka Kaisha, Ltd. v. United States,* 220 Ct.Cl. at 218, 597 F.2d at 1376 n. 3.

### B. Re–Offer of Timber Sale Contract to Croman is Unauthorized Under the Applicable Regulations

█ The 1994 re-offer raises the question whether BLM had the authority to offer this new timber sale contract to the high bidder on the 1990 sale instead of following the competitive bidding process set forth in the applicable regulations for the sale of forest products, 43 C.F.R. §§ 5400, *et seq.* Section 5401.0–6(a), which deals with advertised sales of forest products, states in relevant part that, "All sales other than those specified in § 5402.0–6 shall be made only after inviting competitive bids through publication and posting." Section 5402.0–6(a) states: "When it is determined by the authorized officer to be in the public interest, he may sell at not less than the appraised value, without advertising or calling for bids, timber where the contract is for the sale of less than 250 M board feet." Here, as the sale exceeded 250 M board feet, authority for a non-advertised negotiated sale is lacking.

█ It is imperative that the competitive bidding process be protected and its regulations strictly followed. Although an agency's interpretation of its own regulations is entitled to substantial deference, *Lyng v. Payne*, 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986), in this case the agency's actions are not in accord with the plain language of the applicable regulation. The regulation does not contemplate a negotiated sale, nor was this option at the discretion of the agency. The regulation clearly states that, unless the sale of timber is for less than 250 M board feet, a sale *"shall* be made *only* after inviting *competitive bids* through publication and posting." *See* 43 C.F.R. §§ 5402.0–6, 5402.0–6(a) (emphasis added). Compliance with the applicable regulations is required in order to form a valid contract. *New America Shipbuilders, Inc. v. United States*, 871 F.2d 1077 (Fed.Cir.1989). BLM's decision to "re-offer" the modified sale only to Croman amounted to a de facto negotiated sale which is not authorized under the regulations and constitutes a significant distortion of the competitive bidding process.

### C. 1990 Contract Offer Still Valid

Under regulations, Croman remains the high bidder on the Hoxie Griffin Sale as originally offered. Therefore, as the 1990 Solicitation and the applicable regulations provide, BLM has the choice of awarding the contract to Croman under the 1990 terms, or rejecting the 1990 bids.

█ If BLM decides to award the contract to Croman under the 1990 contract terms, it could negotiate with Croman to make the modifications necessary within the scope of the contract to comply with the FWS consultation recommendations, after the contract has been awarded. *AT & T Communications, Inc. v. Wiltel, Inc.*, 1 F.3d 1201 (Fed.Cir.1993); *Alaska American Lumber Co., Inc. v. United States*, 25 Cl.Ct. 518, 532 (1992) ("[T]hose who enter a contract may take steps at any time after its execution to modify it."). However, absent agreement, a substantial modification after award could constitute a breach of contract. *Stone Forest Industries, Inc. v. United States*, 973 F.2d 1548 (Fed.Cir.1992); *Louisiana–Pacific Corporation v. United States*, 228 Ct.Cl. 363, 656 F.2d 650 (1981).

█ Given the substantial change in circumstances since 1990, the decision whether to reject the 1990 bids or to award the 1990 contract to Croman is one that BLM, and not this court, must make, with the recognition that rejection of all bids may or may not trigger another pre-award contract claim. *See Parcel 49C Limited Partnership v. United States*, 31 F.3d 1147 (Fed.Cir.1994); *P. Francini & Co., Inc. v. United States*, 2 Cl.Ct. 7 (1983).

### CONCLUSION

As it has been determined that the 1994 reoffer by BLM of the substantially modified Hoxie Griffin sale to Croman cannot be a valid part of the 1990 advertised solicitation and that no authority has been shown to exist for a separate noncompetitive negotiated sale of this quantity of timber at this time, it is concluded that the 1994 BLM reoffer action lacks a legal or rational basis.

In this circumstance, it is ORDERED that FINAL JUDGMENT shall be entered:

(1) Declaring that the January 14, 1994 reoffer of the modified Hoxie Griffin Timber Sale to Croman is null and void;

(2) Declaring that the 1990 Hoxie Griffin Timber Sale as originally offered remains open for BLM action to award the contract to Croman as the high bidder or to reject the bids;

(3) Providing that except to the extent granted in (1) and (2) above, any further relief sought in the complaint and the dispositive motions of the parties is, otherwise, DENIED.