ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Honeywell International, Inc. | ) ASBCA No. 57779 |
| | ) |
| Under Contract No. W911S1-08-F-0131 | ) |

APPEARANCES FOR THE APPELLANT: Terry L. Albertson, Esq.
Robert J. Sneckenberg, Esq.
Crowell & Moring, LLP
Washington, DC

APPEARANCES FOR THE GOVERNMENT: Jeffrey P. Hildebrant, Esq.
Air Force Deputy Chief Trial Attorney
Marvin Kent Gibbs, Esq.
Senior Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE MELNICK

This is the quantum phase of this appeal involving a delivery order (DO) issued to Honeywell International, Inc. (Honeywell) under an Energy Savings Performance Contract (ESPC). Among other things, the DO required the delivery of two solar arrays. In prior summary judgment decisions the Board invalidated the portions of the DO that had recognized the value of Solar Renewable Energy Certificates (SRECs) associated with the arrays' generation. SRECs could not be included among government cost savings that would justify payment under the contract. *Honeywell Int'l, Inc.*, ASBCA No. 57779, 13 BCA ¶ 35,380. Nevertheless, because Honeywell delivered the arrays to the government, the Board recognized Honeywell was entitled to a *quantum valebant* or *quantum meruit* recovery for the goods and services received by the government. *Honeywell Int'l, Inc.*, ASBCA No. 57779, 15-1 BCA ¶ 36,121.

The Board has since held a hearing to address quantum and awards it as discussed in the following decision.

BACKGROUND AND FINDINGS OF FACT[1]

1. On 9 July 2008 the United States Army issued the DO identified above under ESPC No. DE-AM01-99EE73683 (later renumbered DE-AM36-99EE73683) (the Super ESPC) awarded by the Department of Energy to Honeywell. 15-1 BCA ¶ 36,121 at 176,338; 13 BCA ¶ 35,380 at 173,607. Through ESPCs, contractors provide the

---

[1] Some of the citations are to the portions of prior summary judgment decisions finding that the matter is not in dispute.

government with energy conservation measures (ECMs) in exchange for a share of the government's energy savings. 42 U.S.C. § 8287. ESPCs guarantee savings to agencies and dictate payment schedules based upon them. 42 U.S.C. § 8287(a). ESPCs may last for a period of up to 25 years, and a multiyear ESPC is governed by FAR Part 17.1. 42 U.S.C. § 8287(a)(1), (a)(2)(D)(iii).

2. This DO acquired services for Fort Dix, New Jersey, with payments eventually scheduled over 21 years (app. supp. R4, tab 2 at 9, tab 10 at 9.)[2] 13 BCA ¶ 35,380 at 173,607. Relevant here are two solar arrays. The original DO's requirements have been designated Phase I and included a roof mounted unit. The second solar array, Phase II, was added through a modification. 15-1 BCA ¶ 36,121 at 176,338. Phase II was approximately the same size as the Phase I unit and was to be ground mounted adjacent to a controlled humidity warehouse building (R4, tab 16 at 4; tr. 177). Each array would produce 700 kW DC peak production (R4, tab 16 at 3-4). All of the electricity was to be used by Fort Dix, eliminating any need for net metering in support of its sale outside that grid (*id.* at 4).

3. The DO calculated the annual energy savings to the government resulting from the arrays by adding the value of the electricity produced by them to the sales value of the SRECs they generated. SRECs are transferable certificates (here issued by New Jersey) representing the environmental benefits or attributes of one megawatt-hour of solar energy produced by a generator connected to the state's electrical grid. Using contractually specified values for electricity and SRECs over time, Honeywell guaranteed certain annual savings from the ECMs. The DO then scheduled annual payments to Honeywell from the government based upon those savings. The DO provided that Honeywell could sell the SRECs for the government. 15-1 BCA ¶ 36,121 at 176,338. Honeywell understood that if the government's savings in any years were lower than Honeywell's guarantee, Honeywell would bear the cost (tr. 30-31).

4. The Super ESPC required five previously formatted schedules to be submitted by Honeywell for inclusion in the DO, identified as DO-1 through DO-5 (ex. B-1, tab 12 at 80-82). DO-1 lists Honeywell's Estimated Annual Cost Savings for each year, followed by its Proposed Guaranteed Annual Cost Savings for each year and Annual Contractor Payments. For example, as ultimately amended after modification for Phase II, DO-1 estimates $3,293,434 in government cost savings for Year 2, guarantees the lower amount of $3,196,924 in government savings that year, which would then provide Honeywell with a slightly lower $3,196,923 payment. DO-1 lists escalation rates used to determine cost savings, including a 2.8 percent rate for electricity. (App. supp. R4, tab 10 at 7) This is confirmed elsewhere in the DO, which states that the current blended electric rate is $0.1406/kWh, escalating at 2.8 percent (R4, tab 4 at 5). The DO explains that this rate was determined from a review of cost escalations as far back as 1970 (*id.* at 48-49). After

---

[2]   The original schedules included in appellant's supplemental Rule 4, tab 2, contained pages that were cut off. Appellant provided complete pages in its supplemental Rule 4, tab 10.

2

addition of Phase II, the DO provides that expected savings from SRECs would be valued at $0.405/kWh for the first five years, and $0.2025/kWh for years six though ten (R4, tab 16).

5. Schedule DO-2 lists each of the ECMs and provides financial data regarding them. Thus, for the first solar array (Phase I), the schedule states that Honeywell's direct costs, called Total Implementation Expense, are $5,188,721. That figure is $4,248,275 for the Phase II modification. Schedule DO-2 provides a 25 percent markup for each phase (broken into an 18 percent overhead rate and 7 percent profit rate) leading to an Implementation Price of $6,485,901 for the Phase I array and $5,304,278 for Phase II. (App. supp. R4, tab 10 at 8; tr. 35)

6. Schedule DO-3 contains a cash flow worksheet identifying a 6.19 percent interest rate for the financing of the initial DO, and an 8.95 percent rate for Phase II. It also breaks into components each year's government payment identified on DO-2. DO-3 also identifies other performance expenses included within each year's payment. (App. supp. R4, tab 10 at 9)

7. Schedule DO-4 provides the first year energy and cost savings expected from each ECM (app. supp. R4, tab 10 at 10).

8. Schedule DO-5 is titled "Annual Cancellation Ceiling Schedule." It presents two columns of figures for years one through twenty. The first column is titled "Outstanding Capital Investment." The second is titled "Total Cancellation Ceiling." Note 2 of the schedule states that "Cancellation Ceilings for each time period specified...establish the maximum termination liability for that time period." It continues that "[a]ctual total termination costs will be negotiated." Note 1 of the schedule provides that "Outstanding Capital Investment" is a "fixed subset of Total Cancellation Ceiling [which] [c]onstitutes the remaining unamortized principal on total Amount Financed for each time period specified above plus any prepayment charges, as negotiated for the delivery order award." Note 3 permits the contractor to "attach a monthly Financing Termination Liability Schedule which must correspond to the annual amounts submitted...in each year for Outstanding Capital Investment." (App. supp. R4, tab 10 at 11) This latter document was just a monthly version of DO-5 (tr. 74). Honeywell included such a document which identified a Financing Termination Fee for both phases of 106.5 percent (app. supp. R4, tab 10 at 12).

9. New Jersey has a net metering program. It provides full retail credit for solar power generated behind a main electric meter through a net metering agreement. (Tr. 198-99) Notwithstanding the fact that the DO stated that all of the power generated by the arrays would be used on base and that no net metering agreement was required, New Jersey required one anyway because its utility owned the power lines on base (tr. 198; R4, tab 16 at 4). Accordingly, New Jersey's utility executed a net metering agreement for Phase I. However, the utility changed its mind for Phase II. (Tr. 199) Honeywell attempted to address the matter with the New Jersey Board of Public Utilities, and had included the Governor's energy

advisor in the discussions, when the government asked it to stop those communications (tr. 200).

10. Honeywell completed the Phase I array and it was accepted by the government sometime between 8 June and 25 September 2009. 15-1 BCA ¶ 36,121 at 176,338. After the Army transferred authority over the DO to the United States Air Force in October 2009, Honeywell provided the Phase II array on time in April 2010. Though it is designed and installed as required, the government has not connected it to the base grid, tested or accepted it. *Id.*

11. On 22 March 2011, Honeywell submitted a certified claim to the contracting officer, contending the government breached the DO by refusing to accept Phase II, failing to pay interest owed for late payments, and failing to pay an invoice for $2,741,963.06 (R4, tab 50). The contracting officer's final decision rejected the claim, declaring the DO's solar array portions were "voidable" (due to a failure of consideration as the "payment stream required by the task order violates federal property disposition and miscellaneous receipt statutes") and cancelled (R4, tab 53). Honeywell appealed to this Board, seeking a ruling that it was entitled to the payment it sought, or a declaration that it should be compensated for the value of the benefits it provided to the government.

12. The Board has since issued two summary judgment decisions. The first decision, dated 7 August 2013, partially granted summary judgment to the government, agreeing that revenues from SREC sales were not cognizable energy savings under the ESPC statute and that the relevant contracting officers lacked authority to permit Honeywell to sell the government's SRECs. Accordingly, the Board invalidated the DO's inclusion of SREC sales revenues among the savings generated by the solar arrays. 13 BCA ¶ 35,380. The second decision, dated 24 September 2015, acknowledged that Honeywell is entitled to *quantum valebant* and *quantum meruit* damages for the reasonable value of the goods and services it provided under the invalidated portions of the DO. 15-1 BCA ¶ 36,121.

13. The government paid Honeywell $122,258 for Phase I invoices on 1 August 2014 and 1 February 2015. It paid Honeywell $125,653 for a Phase I invoice on 1 May 2016. (Gov't br. at 4; app. reply br. at 5)

14. The government presented unrefuted evidence that the SRECs associated with Phase II had a market value of $2,553,728 (tr. 185). Given that the Phase I array is roughly the same size it should generate SRECs with roughly the same value.

4

Previously, the Board held that Honeywell may recover under *quantum valebant* or *quantum meruit* remedies for "the fair market value of the goods and services delivered to the government pursuant to [the] invalid contract." *Honeywell*, 15-1 BCA ¶ 36,121 at 176,340. Compensation is limited to the value of the benefits to the government. *United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed. Cir. 1986). Here, Honeywell provided both goods and services to the government. First, Honeywell delivered the solar arrays (finding 10). Second, Honeywell financed the arrays for a period of time (findings 2, 6).

Honeywell contends that the DO's schedules dictate their value. It maintains that Schedule DO-2 specifies the agreed prices for the arrays based upon direct costs, overhead, and profit markups. Honeywell then adds its price for a monitoring panel and assigns a portion of "Feasibility & Design Costs" to propose a value for the arrays. Honeywell observes that Schedule DO-3 provides for Honeywell's financing services, establishing agreed upon interest rates Honeywell would charge the government for each solar array and fixing payments to be made over time. Honeywell then contends that DO-5 dictates a 6.5 percent financing termination fee. It says its total recovery should be the value of the arrays, plus continually accruing interest, plus the financing termination fee (minus any government payments). It contends this figure totals $23,240,844 as of 9 May 2017. (App. reply br., revised ex. A)

The government mainly ignores the DO, providing testimony from an engineer who assessed only the Phase II array's electrical production. First, he stated that the arrays' product literature suggest they would degrade 0.8 percent per year. Next, he suggested that Phase II's location required the government to sell its electricity to the local utility at unidentified wholesale rates instead of retail rates. He also excluded any valuation of the financing services Honeywell provided. He escalated future electrical rates by 1.01 percent, rather than 2.8 percent, citing information he said came from National Institutes of Standards (NIST) sources. Based upon this testimony, the government claims Phase II's market value is $700,962, and suggests Honeywell recover nothing for the Phase I array.

Honeywell's position that the contract price dictates the market value of the goods and services it provided traces back to *Pacific Maritime Association v. United States*, 108 F. Supp. 603, 607 (Ct. Cl. 1952) (cited in *Urban Data Systems, Inc. v. United States*, 699 F.2d 1147, 1155-56 (Fed. Cir. 1983)). There, government officials attempted to execute an express contract with an association providing longshoreman for 1.7 cents per man-hour. Though no express contract was approved by the government, it received the benefit of the services sought and was therefore required to pay their value. The court declared that "[n]o better answer to this can be given than what the parties agreed upon, to wit, 1.7 cents per man-hour." *Pacific Maritime Ass'n*, 108 F. Supp. at 607.

Here, the DO promised that Honeywell would deliver 2 solar arrays to the government at an agreed upon price financed over 21 years at the established interest rates, with 2 additional elements. First, Honeywell was statutorily required to guarantee that the

government would experience annual savings from the DO. 42 U.S.C. § 8287(a)(2)(B). Accordingly, DO-1 guarantees government savings for each of its years that are higher than its payments (finding 4). Honeywell understood that if actual government savings in any year were lower than its guarantee then Honeywell would bear that loss (finding 3). Because the solar array portions of the DO have been invalidated, they are no longer within the scope of that guarantee. Second, the arrays were expected to generate SRECs that added to the government's energy savings. The differences between what the DO promised and what the government received distinguishes this appeal from *Pacific Maritime Association.*

Nevertheless, though the DO price should not be summarily accepted, it guides the determination. According to Schedule DO-2, the implementation price for Phase I was $6,485,901 and the implementation price for Phase II was $5,304,278, totaling $11,790,179. Included in the prices was a 25 percent markup composed of 18 percent overhead and 7 percent profit. (Finding 5) By consenting to these prices, the government demonstrated that it initially valued the arrays for at least this amount of money. We find that a reasonable determination of *quantum valebant* is to subtract the value of the SRECs and the savings guarantee from the implementation price.

Unrefuted testimony established that the SRECs associated with Phase II were worth $2,553,728. Subtracting that figure from the Phase II Implementation Price ($5,304,278) leaves $2,750,550. Given that the Phase I array is roughly equal in size and production, the SRECs associated with it should have the same value. (Finding 14) Subtracting $2,553,728 from the Phase I Implementation Price ($6,485,901) results in $3,932,173. The most likely component of Honeywell's price reflecting the value of its savings guarantee is its seven percent profit. Accordingly, that value is subtracted from the figures as well. The value of Phase I therefore becomes $3,656,921 and Phase II is $2,558,011.

The government seeks departure from several of the premises and inputs in the DO to support its lower valuation of $700,962. First, without citation to the record, the government suggests that Phase I has no value because between 2014 and 2016 Honeywell issued invoices for it that were paid by the government. Nothing about the fact the government has made some payments toward Phase I relieves it of its responsibility to pay *quantum meruit* and *quantum valebant* for the full value of the benefits it has received. At most, the government's payments present offsets to be applied later in this analysis.

Second, the government engineer vaguely testified that he applied a 0.8 percent annual degradation rate to the arrays' performance that he said he obtained from the manufacturer's "literature" (tr. 177-78). However, he did not specifically identify that material and the government did not produce it. Additionally, if such a recognized degradation rate was known to significantly reduce the arrays' performance over time, then it is likely the parties would have accounted for it in the implementation prices and payment calculations, especially given Honeywell's guarantee of savings. There is no such evidence.

6

Next, the engineer applied an unidentified electrical rate to the determination of Phase II's value that he described as "wholesale." He thought this unspecified rate was more applicable than the retail rate applied to Phase I because Phase II was not adjacent to any buildings to which it could be connected and only powered private distribution lines. Though admitting he did not really know, the engineer speculated that New Jersey's utility would only purchase the electricity produced by Phase II at a wholesale rate (tr. 179). Similarly, the engineer applied a 1.01 percent electrical rate escalation that he obtained from unidentified and unproduced "NIST tables."[3]

Contrary to the beliefs of the government's engineer, the DO states that both phases were intended to produce electricity for Fort Dix and that Phase II was to be located adjacent to the controlled humidity warehouse (finding 2). The DO stipulated to a "blended" electrical rate of $0.1406/kWh. Additionally, the DO stipulated to a 2.8 percent escalation rate, which it explained resulted from a review of cost escalation in the state since 1970. (Finding 4) Although the evidence indicates that, like Phase I, a net metering agreement with New Jersey's utility became necessary to connect Phase II to the base power lines, the government asked Honeywell to cease pursuing that agreement. From that, the government's engineer merely guesses now that New Jersey's utility never would have agreed to an arrangement to permit Phase II to be used as intended. Given the record, the government fails to demonstrate that Phase II could not have been used as contemplated and that the DO's agreed upon electrical and escalation rates are invalid.

Honeywell seeks amounts for other line items on Schedule DO-2. First, it seeks $25,667 for a "Solar Photovoltaic-monitoring panel" (R4, tab 10 at 8). Honeywell has not previously sought payment for this item and the Board lacks jurisdiction over any claim not presented to the contracting officer. *See Taj Al Safa Co.,* ASBCA No. 58394, 13 BCA ¶ 35,278. To remain within the scope of a claim, an action must arise from the same operative facts as those presented to the contracting officer. *See Am. Gen. Trading & Contracting, WLL,* ASBCA No. 56758, 12-1 BCA ¶ 34,905 at 171,639-40. Honeywell's certified claim refers to its completion and delivery of the Phase I and II arrays, and seeks payment for them (R4, tab 50). Honeywell does not mention delivering a monitoring panel for which it was not paid. Such a contention involves different operative facts than its allegations about the arrays. Accordingly, the Board lacks jurisdiction to entertain Honeywell's request to recover for the value of a monitoring panel. Additionally, Honeywell's complaint does not seek payment for a monitoring panel, its motion for summary judgment claiming entitlement for *quantum valebant* recovery does not include a monitoring panel among the benefits it contends were provided to the government, and the Board never held that Honeywell delivered a monitoring panel to the government.

---

[3]  The contracting officer vaguely repeated the engineer's methodology, also advocating for the application of an unidentified wholesale rate and escalation factor (tr. 114). However, her testimony was influenced by the engineer (tr. 115).

7

Another line item from Schedule DO-2 is $701,141 that the document calls "Feasibility & Design Costs" (R4, tab 10 at 8). Honeywell has characterized this as "engineering" costs (tr. 82). Honeywell seeks to prorate a total of $323,445 of these costs to the solar arrays, saying their value was increased by that amount. Honeywell has not proven what this line item actually paid for, or that any prorated portion of it increased the value of the arrays.

Having established the value of the goods Honeywell delivered, or *quantum valebant*, it is also necessary to determine the value of the services it delivered, or *quantum meruit*. As observed, the DO also financed the solar arrays for Honeywell, relieving the government from making full payment upon delivery and establishing a payment schedule over 21 years. This financing service provided a benefit beyond the mere value of the arrays. In Schedule DO-3, the government agreed to a 6.19 percent interest rate for Phase I and an 8.95 percent rate for Phase II (finding 6). Again, having consented to the application of these rates, the government must have perceived the financing to provide at least that much value. Honeywell's damages calculation seeks interest for the Phase I array commencing in August 2008, the first month after the DO was awarded, and for it to start accruing in November of 2009 for Phase II, prior to delivery (app. reply br., ex. A).

Honeywell's compensation is limited to the value of the services the government received from it. *Amdahl Corp.*, 786 F.2d at 393. Honeywell has failed to show its financing benefitted the government prior to the arrays' delivery. The undisputed facts are imprecise for Phase I, stating only that the array was completed and accepted sometime between 8 June and 25 September 2009. A rough midpoint is 31 July 2009. Phase II's undisputed facts are also somewhat vague, stating that the array was supplied and installed in April 2010, so a midpoint is 15 April. (Finding 10) This benefit continued until the government rescinded the solar portion of the DO in its 21 June 2011 final decision purporting to cancel "the voidable portions of the task order" (finding 11). *See Amdahl*, 786 F.2d at 393 (noting that *quantum valebant* and *quantum meruit* remedies apply to benefits received by the government prior to a contract's rescission for invalidity). Accordingly, interest accrued on the Phase I array's $3,656,921 value at 6.19 percent from 31 July 2009 until 21 June 2011, and it accrued on Phase II's $2,558,012 at 8.95 percent from 15 April 2010 until 21 June 2011.

Honeywell maintains that any *quantum valebant* or *quantum meruit* recovery should include a 6.5 percent early termination premium in accordance with Schedule DO-5's Annual Cancellation Ceiling Schedule (finding 8). Honeywell has not proven this contention. In accordance with 42 U.S.C. § 8287(a)(2)(D)(iii), the DO is governed by FAR Part 17, which requires the contracting officer to establish cancellation ceilings for each program year after the first. FAR 17.106-1(c). Schedule DO-5 provides those annual ceilings, which both it and the Super ESPC stress "establish the maximum termination liability," while "[a]ctual total termination costs will be negotiated" (ex. B-1, tab 12 at 82; app. supp. R4, tab 10 at 11 n.2).

8

Honeywell relies upon the fact that DO-5 permitted it to attach a monthly Financing Termination Liability Schedule, which breaks the schedule into monthly amounts and identifies 106.50 percent as a "Financing Termination Fee" (finding 8). Taken together, these materials dictate the maximum amounts that the government could pay Honeywell in the event of termination for convenience or cancellation of the DO, while stressing that actual costs would be negotiated. However, the Board has not ruled that Honeywell is entitled to either cancellation charges or termination for convenience costs. Here, Honeywell is seeking *quantum meruit* and *quantum valebant* resulting from the Board's ruling that "the provisions of the DO including the sales value of SRECs among the government's energy savings, and the associated payment calculations premised upon those sales, are invalid" and that "the DO's provision permitting Honeywell to sell SRECs" are invalid. *Honeywell,* 13 BCA ¶ 35,380 at 173,613. That recovery is limited to the value of the benefits received by the government.

## CONCLUSION

Honeywell is entitled to $3,656,921 for Phase I, with interest accruing at the agreed financing rate for Phase I of 6.19 percent (finding 6) from 31 July 2009 until 21 June 2011. CDA interest also accrues from 22 March 2011 until payment. However, Honeywell received a payment of $122,258 on 1 August 2014, $122,258 on 1 February 2015, and $125,653 on 1 May 2016 (finding 13), reducing the government's debt accordingly.

Honeywell is entitled to $2,558,011 for Phase II, with interest accruing at the agreed financing rate for Phase II of 8.95 percent (finding 6) from 15 April 2010 until 21 June 2011. CDA interest also accrues from 22 March 2011 until payment.

Dated: 1 August 2017

MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

9

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 57779, Appeal of Honeywell International, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals
